933 F.2d 1037
 290 U.S.App.D.C. 31, 59 USLW 2749, 33
Soc.Sec.Rep.Ser. 490,
Medicare&Medicaid Gu 39,230
 Alice GATEWOOD, Individually, and as Personal Representative
of the Estate of William H. Gatewood, Appellant,
v.
WASHINGTON HEALTHCARE CORPORATION, t/a Washington Hospital
Center, et al., Appellees.
 No. 90-7094.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 8, 1991.
Decided May 28, 1991.
 
 Appeal from the United States District Court for the District of Columbia (Civil Action No. 89-0248).
 Margaret A. Beller, Washington, D.C., for appellant.
 Terri A. Steinhaus, with whom James A. Hourihan was on the brief, Washington, D.C., for appellees Coastal Emergency Services of Washington, D.C., Inc., and Betty Laygo, M.D.
 Robert E. Higdon, Washington, D.C., entered an appearance for appellees Washington Hosp. Center, et al.
 Before EDWARDS, RUTH BADER GINSBURG and THOMAS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.
 HARRY T. EDWARDS, Circuit Judge:
 
 
 1
 This case involves the scope of the Emergency Medical Treatment and Active Labor Act (the "Emergency Act" or "Act"), 42 U.S.C.A. Sec. 1395dd (West Supp.1991), a statute enacted by Congress to prevent hospitals from "dumping" patients in need of emergency care. Appellant Alice Gatewood's husband died of a heart attack the day after he was discharged from the emergency room of appellee, Washington Hospital Center ("WHC"), where he was diagnosed as suffering from "musculoskeletal pain." Mrs. Gatewood filed suit in federal court, raising an Emergency Act claim and pendent local claims for malpractice. The District Court dismissed the case, holding that the Emergency Act does not provide a cause of action for fully insured patients who are misdiagnosed in hospital emergency rooms. See Gatewood v. Washington Hosp. Center, et al., Civ. Action No. 89-0248 (D.D.C. May 23, 1990), reprinted in Joint Appendix ("J.A.") 231.
 
 
 2
 On review, we find the District Court erred to the extent that it premised dismissal on Mr. Gatewood's status as an insured patient. Whether a patient carries health insurance is not critical to a claim under the Emergency Act, which by its own terms covers "any individual" who presents at an emergency room. We agree with the District Court, however, that the Emergency Act does not create a broad federal cause of action for emergency room negligence or malpractice. In the absence of any allegation that the WHC departed from its standard emergency room procedures in treating Mr. Gatewood, questions related to Mr. Gatewood's diagnosis remain the exclusive province of local negligence and malpractice law. Accordingly, we affirm the dismissal of the complaint for failure to state a claim upon which relief can be granted.
 
 I. BACKGROUND
 
 3
 This case arises from the treatment provided William Gatewood at the WHC emergency room on the night of January 28, 1987. Mr. Gatewood was fully insured when he arrived at the WHC complaining of pain radiating down his left arm and into his chest. Dr. Mehlman, a resident, examined Mr. Gatewood and performed blood tests, a chest x-ray and an EKG test. Together with Dr. Laygo, the attending physician on the night in question, Dr. Mehlman reviewed the test results and diagnosed Mr. Gatewood as suffering from musculoskeletal pain. The doctors discharged Mr. Gatewood from the hospital with instructions to use a heating pad, take Tylenol pain medicine and call his personal physician for a follow-up appointment. The next morning, Mr. Gatewood died of a heart attack.
 
 
 4
 In January 1989, Mrs. Gatewood brought the instant action in federal district court. Named as defendants in her suit were the WHC, Drs. Mehlman and Laygo, and Coastal Emergency Services of Washington, D.C. ("Coastal"), under contract to provide emergency room services for the WHC on the date of Mr. Gatewood's treatment (collectively, the "appellees"). Mrs. Gatewood alleged that the emergency room treatment of her husband violated the Emergency Act, and also raised pendent local claims for malpractice. See Amended Complaint, reprinted in J.A. 9.
 
 
 5
 In May 1990, the District Court awarded summary judgment to the appellees and dismissed the action. The District Court held that the Emergency Act was intended to prohibit "dumping" of patients for economic reasons, and that it provided no cause of action for fully insured patients presenting typical claims of "failure to properly diagnose." See Gatewood, mem. op. at 2, reprinted in J.A. 232. Without a viable federal claim before it, the District Court dismissed Mrs. Gatewood's pendent local law claims for lack of jurisdiction. See id. at 3, reprinted in J.A. 233. This appeal ensued.
 
 II. ANALYSIS
 
 6
 The Emergency Act was passed in 1986 amid growing concern over the availability of emergency health care services to the poor and uninsured. The statute was designed principally to address the problem of "patient dumping," whereby hospital emergency rooms deny uninsured patients the same treatment provided paying patients, either by refusing care outright or by transferring uninsured patients to other facilities. See H.R.Rep. No. 241, 99th Cong., 1st Sess., pt. 1, at 27 (1985); id., pt. 3, at 5; see also Cleland v. Bronson Health Care Group, Inc., 917 F.2d 266, 268 (6th Cir.1990) (discussing legislative history of Emergency Act); Note, Preventing Patient Dumping: Sharpening the COBRA's Fangs, 61 N.Y.U.L.Rev. 1186, 1187-88 (1986). Reports of patient dumping rose in the 1980s, as hospitals, generally unencumbered by any state law duty to treat, faced new cost containment pressures combined with growing numbers of uninsured and underinsured patients. See Note, supra, at 1189-96.
 
 
 7
 Congress responded with the Emergency Act, which imposes on Medicare-provider hospitals a duty to afford medical screening and stabilizing treatment to any patient who seeks care in a hospital emergency room. Subsection 1395dd(a), the Act's "medical screening requirement," provides that
 
 
 8
 if any individual (whether or not eligible for [Medicare] benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department....
 
 
 9
 42 U.S.C.A. Sec. 1395dd(a) (West Supp.1991). Subsection 1395dd(b) dictates "necessary stabilizing treatment" for emergency conditions, as follows:
 
 
 10
 [i]f any individual (whether or not eligible for [Medicare] benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either--
 
 
 11
 (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
 
 
 12
 (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.
 
 
 13
 42 U.S.C.A. Sec. 1395dd(b)(1) (West Supp.1991). Subsection (c), in turn, restricts transfers prior to stabilization. See 42 U.S.C.A. Sec. 1395dd(c) (West Supp.1991). Hospitals in violation of the Act may be sued by "[a]ny individual who suffers personal harm" as a result. See 42 U.S.C.A. Sec. 1395dd(d)(2)(A) (West Supp.1991).[1]
 
 
 14
 We are faced at the outset with a contention that none of these provisions applies to treatment of patients who, like Mr. Gatewood, are covered by insurance. Citing the statute's legislative history, the appellees argue that the Emergency Act is intended to guarantee emergency room access to uninsured and indigent patients only, and does not bring within its ambit the claims of insured patients or those otherwise able to pay for care. The District Court accepted this assertion, resting its dismissal at least in part on the fact that Mr. Gatewood's "release had nothing to do with insurance, inability to pay or other economic factors." See Gatewood, mem.op. at 2, reprinted in J.A. 232.
 
 
 15
 We find that the District Court erred in relying on Mr. Gatewood's insured status for its holding. Though the Emergency Act's legislative history reflects an unmistakable concern with the treatment of uninsured patients, the Act itself draws no distinction between persons with and without insurance. Rather, the Act's plain language unambiguously extends its protections to "any individual" who seeks emergency room assistance. See 42 U.S.C.A. Sec. 1395dd(a), (b)(1) (emphasis added). We conclude that we are bound by statutory language this clear, at least where, as here, it is not manifestly inconsistent with legislative intent. See United Mine Workers of Am. v. Federal Mine Safety and Health Review Comm'n, 671 F.2d 615, 621 (D.C.Cir.), cert. denied, 459 U.S. 927, 103 S.Ct. 239, 74 L.Ed.2d 189 (1982); Aviation Consumer Action Project v. Washburn, 535 F.2d 101, 106-07 (D.C.Cir.1976).[2] Like the only other circuit court to address this question, see Cleland, 917 F.2d at 269-70, we will give effect to the plain and inclusive terms of the Emergency Act.
 
 
 16
 Nevertheless, we affirm the District Court dismissal on the grounds that appellant has failed to state a cause of action under the Act. While we agree with appellant that the statute reaches "any individual" seeking emergency room care, we cannot agree that it creates a sweeping federal cause of action with respect to what are traditional state-based claims of negligence or malpractice. Mrs. Gatewood's allegations of misdiagnosis, without more, are simply not cognizable under the Emergency Act.
 
 
 17
 The appellant relies primarily on subsection 1395dd(a) of the Act, arguing that an emergency room violates the "appropriate medical screening" requirement whenever it negligently misdiagnoses a patient's condition. Like the Sixth Circuit in Cleland, see 917 F.2d at 271-72, we read the requirement of "appropriate medical screening" differently. As its history makes clear, the Act is intended not to ensure each emergency room patient a correct diagnosis, but rather to ensure that each is accorded the same level of treatment regularly provided to patients in similar medical circumstances. Thus, what constitutes an "appropriate" screening is properly determined not by reference to particular outcomes, but instead by reference to a hospital's standard screening procedures.
 
 
 18
 In our view, then, a hospital fulfills the "appropriate medical screening" requirement when it conforms in its treatment of a particular patient to its standard screening procedures. By the same token, any departure from standard screening procedures constitutes inappropriate screening in violation of the Emergency Act. The motive for such departure is not important to this analysis, which applies whenever and for whatever reason a patient is denied the same level of care provided others and guaranteed him or her by subsection 1395dd(a).[3] In this case, the appellant concedes that Mr. Gatewood received a screening examination, and does not allege that the screening procedure in question differed in any respect from that generally employed by the hospital. Absent some allegation of differential treatment, no claim is stated under subsection 1395dd(a).
 
 
 19
 We recognize, of course, that there may be some instances in which a hospital's normal screening procedure will fall below the standard of care established by local negligence or malpractice law. Nevertheless, we decline the appellant's invitation to incorporate a malpractice or negligence standard into subsection 1395dd(a). The federal Emergency Act is not intended to duplicate preexisting legal protections, but rather to create a new cause of action, generally unavailable under state tort law, for what amounts to failure to treat. Though there may arise some areas of overlap between federal and local causes of action, most questions related to the adequacy of a hospital's standard screening and diagnostic procedures must remain the exclusive province of local negligence law. See Cleland, 917 F.2d at 271-72; Stewart v. Myrick, 731 F.Supp. 433, 436 (D.Kan.1990) (claim for improper emergency room diagnosis and treatment "falls within the ambit of state negligence law, not the federal anti-dumping law"); Evitt v. University Heights Hosp., 727 F.Supp. 495, 497 (S.D.Ind.1989) (same).
 
 
 20
 We do not in this case address the scope of the stabilization and transfer provisions of the Emergency Act, subsections 1395dd(b) and (c). Those provisions are triggered only after a hospital "determines that [an] individual has an emergency medical condition." See 42 U.S.C.A. Sec. 1395dd(b)(1), (c). Here, no such condition was diagnosed, and the statute's stabilization and transfer requirements are therefore inapplicable.
 
 
 21
 We find, then, that the appellant has failed to state a claim under the federal Emergency Act. Absent a viable federal cause of action, we affirm the District Court dismissal of the appellant's pendent local claims for lack of jurisdiction. See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). We express no opinion here as to the validity under local negligence or malpractice law of the appellant's claims against any of the parties named in the amended complaint.
 
 III. CONCLUSION
 
 22
 For the reasons set forth above, we find that the appellant has failed to state a claim cognizable under the Emergency Act. Accordingly, we affirm the District Court dismissal of this case.
 
 
 23
 So ordered.
 
 
 
 [1]
 Subsection (d)(2)(A)'s civil enforcement provision is explicitly limited to actions against participating hospitals. See 42 U.S.C.A. Sec. 1395dd(d)(2)(A) ("Any individual who suffers personal harm ... may, in a civil action against the participating hospital, obtain [damages and equitable relief].") (emphasis added). From this, it seems clear that there is no private cause of action against physicians under the Emergency Act. Accordingly, counsel for the appellant declined at argument to press an Emergency Act claim against Drs. Mehlman and Laygo
 
 
 [2]
 The appellees' reliance on Washburn is misplaced. Though Washburn might justify resort to legislative history if "the literal words of the statute would bring about an end completely at variance with the purpose" of the Emergency Act, see 535 F.2d at 106-07, that is not the situation before us. At most, the plain language of subsections 1395dd(a) and (b) extends the Act's reach beyond that anticipated by Congress; in no way does it undermine or conflict with Congress' purposes to provide uninsured patients with emergency health care and to prevent "dumping." See Cleland, 917 F.2d at 270
 
 
 [3]
 In this respect, we depart from the Sixth Circuit reasoning in Cleland, 917 F.2d at 272. We do not read subsection 1395dd(a) as referring in any way to the "motives" with which an emergency room acts when it provides something less than its normal screening procedure