Ikem ANADUMAKA, a minor, By and Through his mother and next friend Vicky ANADUMAKA, both in her own behalf and that of her son, Plaintiff,

v.

EDGEWATER OPERATING COMPANY, a/k/a Edgewater Medical Center, an Illinois corporation, Defendant.

No. 91 C 5374.

United States District Court, N.D. Illinois, E.D.

May 3, 1993.

Sidney Abelski, Abelski & Assoc., Ltd., Chicago, IL, for plaintiff.

William C. Anderson, III, Sheri Helene Lewis, Lord, Bissell & Brook, Chicago, IL, for defendant.

## MEMORANDUM AND ORDER

MORAN, Chief Judge.

Plaintiffs Ikem Anadumaka (Ikem) and Vicky Anadumaka (Anadumaka) bring this action pursuant to the Emergency Medical Treatment & Active Labor Act, 42 U.S.C. § 1395dd (Patient Anti–Dumping Act). Plaintiffs claim that Ikem was refused medical treatment at defendant Edgewater Medical Center (Edgewater), in violation of the Patient Anti–Dumping Act.[1] Defendant now moves for summary judgement. For the reasons set forth below, defendant's motion is granted.

### FACTS

At approximately 2:15 p.m. on March 14, 1991, Anadumaka found her seventeen-month old son Ikem, on the floor in the living area with peanuts around him. He had vomited some peanuts, his breathing was forced, and he was crying. After performing the Heimlich maneuver and retrieving a peanut, she proceeded to call for an ambulance. According to one of the paramedics, Idelle Dunn (Dunn), Ikem was very congested but was not choking and did not appear to have an obstruction in his airway. The ambulance took Anadumaka and Ikem to Edgewater's emergency room, where they arrived sometime between 2:45 p.m. and 3:17 p.m.[2] Upon arrival at Edgewater, the paramedics escorted the Anadumakas to the emergency room. Anadumaka was told by a secretary and the paramedics to sit down and wait to be seen. Dunn informed one of the nurses about Ikem's medical condition. Sometime between 3:30 and 4:00 p.m.,[3] Anadumaka and Ikem were told to go back to a cubicle, where some information was taken by Nurse Veena Amaralilit (Amaralilit). Amaralilit took Ikem's "respiration and pulse" and got a "little history from the mother." The nurse concluded that Ikem had no respiratory distress, had a cold, and was taking cough syrup and Tylenol at that time. The nurse recorded her observations (e.g., pulse, medication, etc.) on a document entitled "Edgewater Medical Center Emergency Department Triage Note" (Triage Note). Although Anadumaka agrees that she furnished information to a hospital employee, she disputes that the hospital provided any triage or medical

---

1. Plaintiffs' complaint included a common law state claim for emotional distress (count II). However, on April 21, 1993, plaintiffs' motion to voluntarily dismiss the state law claim pursuant to F.R.C.P 41 was granted.

2. There is conflicting testimony as to when the ambulance left the Anadumaka residence and when the ambulance arrived at Edgewater Hospital. According to the paramedics' report and Dunn's deposition, the ambulance left the scene at 3:00 and arrived at the hospital at 3:17 p.m. (Exh. 1 to Dunn dep and to Anadumaka dep).

3. There is some dispute as to what time Anadumaka spoke with a woman sitting at a cubicle. She claims that she spoke with some woman at approximately 4:00 p.m.; however, the Triage Note records the time as 3:30 p.m.

treatment. Anadumaka also provided financial information to the hospital.[4] The emergency record lists Anadumaka as unemployed, with no medical insurance.

The Anadumakas then sat in the emergency waiting room. At some point thereafter (approximately between 4:00 and 4:30 p.m.), Anadumaka telephoned a taxicab and left Edgewater with Ikem. Sometime after the Anadumakas left Edgewater, Amaralilit went to look for Ikem to bring him back into the emergency area so that he could be seen by a physician. She was not able to find them. The Anadumakas returned home after leaving Edgewater and gathered a few things (*i.e.*, more money, diaper bag, etc). The Anadumakas then left their home and were taken by an acquaintance to Cook County Hospital. The following morning Cook County Hospital physicians performed an elective bronchoscopy on Ikem and removed peanut fragments from his respiratory system.

## DISCUSSION

■ Plaintiffs allege that Edgewater violated the Patient Anti–Dumping Act by failing to (1) provide an appropriate medical screening; (2) diagnose Ikem as having an emergency medical condition; (3) provide such further medical examination and treatment to stabilize Ikem; and (4) act for at least ninety minutes.

The Patient Anti–Dumping Act requires a hospital to provide "an appropriate medical screening examination within the capability of the hospital's emergency department" to any individual that comes into the emergency department and requests an examination or treatment. 42 U.S.C. § 1395dd(a). In addition, the Patient Anti–Dumping Act states that if any individual has "an emergency medical condition," the hospital must either provide further medical treatment to stabilize the medical condition or transfer the individual to another medical facility. 42 U.S.C. § 1395dd(b). The statute further

mandates that a hospital may not delay an appropriate medical screening examination, or further medical examination and treatment (required under subsection (b)), in order to inquire about the individual's method of payment or insurance status. 42 U.S.C. § 1395dd(h).

A hospital is in violation of subsection (a) of the Patient Anti–Dumping Act if an "appropriate medical screening" of a patient is not performed. Ikem was seen by Amaralilit during the March 14, 1993 emergency room visit. The nurse testified in her deposition that she looked at the child, took his respiration and pulse, and got a little medical history from his mother. Furthermore, she testified that Ikem was sleeping and that there was no sign of choking and he had no difficulty breathing. (Amaralilit dep. at 87–88). Amaralilit testified that she spent at least five or ten minutes assessing the condition of Ikem and her observations were documented on the Triage Note. (Exh. 5 to Anadumaka dep). On that medical record Ikem's pulse and respiration were noted, as well as his medical condition and the medication he had taken. Although plaintiffs admit that they were called back to a cubicle to provide a member of the hospital staff with some information, they maintain that an appropriate examination of Ikem was never performed. It is apparent from reading Anadumaka's deposition transcript that she was not aware that the woman she was speaking with at the cubicle was a nurse or that the nurse was, at that time, performing a screening examination of Ikem. However, that does not change the fact that the nurse was screening Ikem and was assessing his medical condition.

■ Plaintiffs spend the majority of their brief discussing the medical treatment that Ikem should have received, and disputing Amaralilit's assessment of Ikem. However, neither of those arguments carry much weight with respect to the Patient Anti–Dumping Act. The statute requires that the hospital perform an appropriate *screening* of

**4.** Again, there is some dispute as to when this information was taken. Anadumaka's deposition seems to indicate that financial information was provided during her initial interview with the woman in the cubicle (apparently to Amaralilit).

However, the defendant maintains that after the triage examination, Anadumaka provided general information (including financial information) to the secretary, Erlinda Trinidad.

every patient that comes into the emergency room seeking an examination or treatment. The Patient Anti–Dumping Act does not address or monitor further treatment of the patient, that is, unless the hospital determines that the patient has an emergency medical condition. In that case, the hospital must provide the patient with necessary stabilizing treatment. Here Amaralilit did screen Ikem and classified him to be in "non-urgent" condition.[5] Although plaintiffs disagree with the nurse's determination that Ikem had a non-emergency condition, that argument is one of misdiagnosis and one that is not addressed by the statute. *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1041 (D.C.Cir.1991); *Petrovics v. Prince William Hospital Corp,* 764 F.Supp. 415, 418 (E.D.Va.1991); *Deberry v. Sherman Hospital Association,* 769 F.Supp. 1030, 1034–35 (N.D.Ill.1991); *Evitt v. University Heights Hospital,* 727 F.Supp. 495, 497–98 (S.D.Ind. 1989).

■ According to the medical record (which has not been challenged by plaintiffs), an appropriate screening of Ikem was performed and therefore the defendant did not violate subsection (a) of the statute. Furthermore, it is important to point out that the purpose of the statute is to prevent emergency rooms from refusing care to an individual because of his or her financial condition or lack of medical insurance. *Deberry v. Sherman Hospital Association,* 775 F.Supp. 1159, 1162 (N.D.Ill.1991); *see also Gatewood,* 933 F.2d at 1041. In other words, the statute mandates that all patients be treated equally with respect to the medical screening examination. Therefore, a hospital performs appropriate medical screening when "it conforms in its treatment of a particular patient to its standard screening procedures." *Gatewood,* 933 F.2d at 1041. Here the evidence demonstrates that the standard practice of triage and registration were performed in Edgewater's emergency room. Plaintiffs

neither dispute this evidence (the medical records and depositions) nor provide evidence to indicate that they were treated differently because of their financial condition. Plaintiffs point out that hospital personnel inquired into Anadumaka's insurance coverage and her employment; however, those are standard questions that were documented on a standard computerized hospital form. (*See* Trinidad aff. and Exh. 2 to Anadumaka dep).

■ Plaintiffs also allege that Edgewater violated subsection (b) of the Patient Anti–Dumping Act. Subsection (b) states that the hospital must provide necessary stabilizing treatment to any patient that the hospital determines has an emergency medical condition. Here Ikem was not diagnosed with an emergency medical condition and therefore the hospital cannot be in violation of subsection (b) of the statute.[6] *Cleland v. Bronson Health Care Group, Inc.,* 917 F.2d 266, 271 (6th Cir.1990) (stating that if an emergency condition is not detected, the hospital cannot be charged with failure to stabilize a known emergency condition). Again, this statute does not provide recourse for claims of misdiagnosis.

■ Finally, plaintiffs contend that because defendant failed to act for at least ninety minutes, it was in violation of the Patient Anti–Dumping Act. Under subsection (h) of the statute a hospital may not delay an appropriate medical screening examination, or further medical examination or treatment required under subsection (b), in "order to inquire about the individual's method of payment or insurance status." Plaintiffs have provided no evidence to indicate that the medical screening examination was delayed because of Anadumaka's financial status. According to the medical records and supporting affidavits Anadumaka was not questioned about her insurance or her employer until after the triage nurse had

---

5. On the triage note form, there are three categories for the nurse to classify the patient: emergent, urgent or non-urgent.

6. In addition, Anadumaka was told to wait and that Ikem would be treated. After Anadumaka left, Amaralilit and Doctor Charles Thomas went

to find Ikem, so that he could be treated. Dr. Thomas testified in his deposition that: "I can guarantee you [Ikem] would have been seen and treated." (Thomas dep. at 67). There is no evidence to indicate that Ikem would not have been treated had he stayed at Edgewater.

screened Ikem.[7] In addition, plaintiffs' argument that treatment of Ikem was delayed because of Anadumaka's financial condition is without merit. Subsection (h) applies *only* with respect to the screening examination, or further medical treatment, as required under subsection (b)—which did not apply in Ikem's case. Plaintiffs have not provided any evidence to indicate that their financial condition was a factor considered by the hospital when providing emergency care to Ikem.

Based upon the uncontroverted evidence, a reasonable trier of fact could not find that Ikem did not receive an appropriate medical screening. Furthermore, a reasonable trier of fact could not conclude that subsection (b) of the statute (requiring necessary stabilizing treatment for emergency medical conditions) was violated since the hospital did not determine Ikem to have an emergency medical condition. Plaintiffs' claims essentially allege misdiagnosis, which is not cognizable under the Patient Anti-dumping Act. The claims are more appropriately classified as traditional state-based negligence or malpractice claims. Defendant's motion for summary judgment is granted.

7. According to the Triage Note, Amaralilit screened Ikem at 3:30 p.m. The emergency room record, that documents the patient's (or guardian's) employer and insurance coverage, was prepared at 3:54 p.m, according to the document. Furthermore, Erlinda Trinidad, the emergency room registration secretary, stated in her affidavit that registration of patients is conducted only after a triage nurse has screened the patient.