**Dennis Wayne RICHMOND, Plaintiff,**

v.

**COMMUNITY HOSPITAL OF ROANOKE VALLEY, et al., Defendants.**

Civ. A. No. 93–849–R.

United States District Court, W.D. Virginia.

April 7, 1995.

Order Staying Proceedings Pending Applications for Appeal May 8, 1995.

Michael McHale Collins, Collins & Mooney, Covington, VA, for plaintiff.

Powell M. Leitch, III, Woods, Rogers, & Hazlegrove, Roanoke, VA for Community Hosp. and Young U. Kim, defendants.

Henry M. Sackett, III, Edmunds & Williams, Lynchburg, VA, for Emergency Room Physician, etc. and P.M., Thought to be Dr. Todd Palmerton, etc.

## MEMORANDUM OPINION

TURK, District Judge.

This matter comes before the court on defendant Community Hospital of the Roanoke Valley's ("Community Hospital") motion for partial summary judgment pursuant to Federal Rule of Civil Procedure 56. Upon careful consideration of the record, the applicable law, the briefs submitted by the parties, and the arguments presented by counsel at the hearing, the court finds that it must grant defendant's motion for partial summary judgment.

## I. BACKGROUND

On the afternoon of November 9, 1991, plaintiff Dennis Wayne Richmond ("Richmond") arrived at Community Hospital's emergency department, complaining of left rib pain. Robin Wright, a registered nurse on duty, "triaged" plaintiff; that is, she checked his vital signs, conducted a ten minute examination, took a verbal history, and made a written nursing assessment.

Dr. Todd Palmerton, an emergency department physician, then examined Rich-

mond. Among other things, Dr. Palmerton noted that plaintiff experienced tenderness in the "lateral left 4th–6th ribs." Dr. Palmerton sent Richmond for chest x-rays, which a radiologist duly interpreted. Based upon his findings and the x-ray results, Dr. Palmerton diagnosed plaintiff as having intercostal neuralgia. Dr. Palmerton prescribed an anti-inflammatory medication and instructed plaintiff to return for a follow-up visit if his symptoms worsened.

Finally, Nurse Judy Anderson discharged plaintiff, instructing him to return to the emergency department if his condition deteriorated or if new problems arose.

Plaintiff returned to the emergency room two days later on November 11, 1991. Community Hospital followed the same general procedures. Nurse Shannon Weakley triaged plaintiff, taking his vital signs and verbal history. Plaintiff complained of "severe left chest and back pain." After triage, Dr. Young Kim, on duty in the emergency department, examined and treated plaintiff. Dr. Kim sent Richmond for a second set of x-rays. Based on his findings and the radiologist's report, Dr. Kim diagnosed plaintiff with left lower lobe pneumonia, prescribed an antibiotic and Tylenol, and instructed him to return in four days for follow-up. Dr. Kim also, at plaintiff's request, referred him to a pulmonologist for more specialized follow-up. Lastly, Nurse Susan Alderman discharged plaintiff with the following instructions: "Please take the medicine as prescribed. Please return around 8 a.m. November 15, 1991 for a check examination. No work until you are checked and released. Return earlier if you have much more trouble."

On the same day, plaintiff saw private physician Dr. Kirk Hippensteel. His diagnosis was "[a]cute pneumonia with peripneumonic pleuritis." He suggested that plaintiff call back later in the week if his symptoms had not improved and that plaintiff return in three weeks for follow-up and x-rays.

On November 13, 1991, Richmond's condition still had not improved. He presented himself to the Alleghany Regional Hospital emergency department, where they performed a chest x-ray, arterial blood gasses, a urinalysis, and a complete blood count.

Richmond remained at Alleghany Regional Hospital for twenty-one days and underwent a thoracotomy with decortication.

On November 8, 1993, plaintiff filed a complaint in this court claiming that Community Hospital violated the Emergency Medical Treatment and Active Labor Act of 1986 ("EMTALA"), 42 U.S.C. § 1395dd. Specifically, plaintiff alleges that Community Hospital failed to provide an appropriate medical screening examination, failed to stabilize his condition, and transferred him prior to stabilizing his condition. Plaintiff also alleges pendent state law claims for negligent examination, treatment, and diagnosis of his condition.

Community Hospital has moved for partial summary judgment as to the EMTALA claims. The parties have thoroughly briefed the relevant issues, and the court held a hearing in this matter on March 7, 1995. Therefore, defendant's motion is ripe for this court's consideration.

## II. ANALYSIS

Jurisdiction of the court is proper pursuant to 28 U.S.C. §§ 1331 and 1367.

Federal Rule of Civil Procedure 56(c) states that summary judgment is proper where "there is no genuine issue as to any material fact." In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 718 (4th Cir.1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)), *cert. denied*, 502 U.S. 1095, 112 S.Ct. 1172, 117 L.Ed.2d 417 (1992). If defendant carries this burden, "[t]he burden then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact." *Id.* at 718–19 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986)).

■ Moreover, "[o]nce the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for

trial." *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir.1992). Although admissibility of the evidence at trial is unnecessary, "'[u]nsupported speculation is not sufficient to defeat a summary judgment motion.'" *Id.* (quoting *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987)).

■ Congress passed EMTALA to address the issue of treatment of indigent and uninsured patients in hospital emergency rooms:

> The statute was designed principally to address the problem of "patient dumping," whereby hospital emergency rooms deny uninsured patients the same treatment provided paying patients, either by refusing care outright or by transferring uninsured patients to other facilities.

*Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1039 (D.C.Cir.1991) (citing H.R.Rep. No. 241, 99th Cong., 1st Sess., pt. 1, at 27 (1985)). Plaintiff alleges in Counts I through III violations of EMTALA in three respects. In Count I, plaintiff avers that Community Hospital denied him an "appropriate medical screening examination." 42 U.S.C. § 1395dd(a).[1] Plaintiff alleges in Count II that Community Hospital failed to provide the necessary stabilizing treatment for an emergency medical condition and in Count III that Community Hospital transferred him prior to stabilization of an emergency medical condition. 42 U.S.C. §§ 1395dd(b), (c).[2]

### A. Count I: Propriety of Plaintiff's Medical Screening Examination

■ EMTALA does not specifically define what constitutes an "appropriate medical screening examination." *See* 42 U.S.C. § 1395dd(e) (defining terms). Various federal courts, including the Fourth Circuit Court of Appeals, however, have developed standards under which to analyze the concept. Most recently, the court in *Power v. Arlington Hospital Association* set forth the essence of an appropriate medical screening examination:

> "[t]he plain language of [EMTALA] requires a hospital to develop a screening procedure designed to identify such critical conditions that exist in symptomatic patients and to apply that screening procedure uniformly to all patients with similar complaints." [*Baber*, 977 F.2d at 879.] The key requirement is that a hospital "apply its standard of screening *uniformly* to all emergency room patients, regardless of whether they are insured or can pay. The Act does not impose any duty on a hospital requiring that the screening result in a correct diagnosis." [*Brooks v. Maryland Gen. Hosp., Inc.*, 996 F.2d 708, 710–11 (4th Cir.1993) (emphasis original).]

42 F.3d 851, 856 (4th Cir.1994). Moreover, the courts uniformly agree that "[EMTALA] does not create a broad federal cause of action for emergency room negligence or malpractice." *Gatewood*, 933 F.2d at 1039. *See also Baber*, 977 F.2d at 880 (recognizing that "EMTALA is no substitute for state law medical malpractice actions"); *Deberry v. Sherman Hosp. Ass'n*, 769 F.Supp. 1030, 1034 (N.D.Ill.1991) (noting that EMTALA creates a federal cause of action "'for what amounts to failure to treat,'" not "a sweeping cause of action for malpractice claims tradi-

---

**1.** Pursuant to the medical screening requirement,

> if any individual ... comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition ... exists.

42 U.S.C. § 1395dd(a).

**2.** Subsection 1395dd(b) states, in relevant part, as follows:

> (1) In general. If any individual ... comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—
> > (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
> > (B) for transfer of the individual to another medical facility in accordance with subsection (c).

Subsection 1395dd(c), in turn, restricts the transfer of any individual having an emergency medical condition from the hospital.

tionally protected by state law" (citing *Gatewood*, 933 F.2d at 1041)).

The court in *Baber* recognized that compliance with EMTALA necessitated *some* screening procedure. 977 F.2d at 879. However, the court noted that "[w]hile a hospital emergency room may develop one general procedure for screening all patients, it *may* also tailor its screening procedure to the patient's complaints or exhibited symptoms." *Id.* at 879 n. 6 (emphasis added).

 The court is of the opinion that while plaintiff may have sufficient evidence to prove his state law claims for negligence and medical malpractice, he has not met his burden on summary judgment as to his EMTALA claim for failure to provide appropriate medical screening. The hospital has provided uncontroverted evidence that it adheres to a general screening procedure for all emergency room patients:

1. triage—to quickly ascertain the immediacy of the patient's need for treatment.

2. history and physical—to obtain information concerning the nature of the patient's problem.

3. physician examination—to explore the precise nature of the patient's problem, in order to lead to an appropriate course of treatment.

Defendant's Memorandum in Response to Plaintiff's Supplemental Brief at 2. Defendant has presented unrefuted evidence that it followed this general procedure on each of the two occasions on which Richmond presented himself to the emergency room.

In his efforts to uncover some evidence of differential treatment, plaintiff has sought to discover "the medical records of other patients who have presented themselves to the emergency department in the same or similar condition as plaintiff."[3] Irrespective of what such discovery might or might not reveal, the results cannot salvage plaintiff's EMTALA claim. As stated above, Community Hospital *may*—but need not—develop specialized screening procedures. Community Hospital has not established any such procedures. Plaintiff concedes that Community Hospital did follow its general procedures. Any discrepancies that might surface in the treatment of patients presenting with similar symptoms would be relevant, if at all, to whether Community Hospital had met the requisite standard of care.

[A]pplication of [existing hospital procedure] necessarily requires the exercise of medical training and judgment. Hospital personnel must assess a patient's signs and symptoms and use their informed judgment to determine whether a critical condition exists. Thus, while EMTALA requires a hospital emergency department to apply its standard screening examination uniformly, *it does not guarantee that the emergency personnel will correctly diagnose a patient's condition as a result of the screening.*

*Baber*, 977 F.2d at 879 (emphasis added).

Nor is the affidavit of Richmond's medical expert sufficient to meet plaintiff's burden on summary judgment. In essence, the affiant opines, with the benefit of hindsight, that the care rendered plaintiff by Drs. Palmerton and Kim was substandard, resulted in the misdiagnoses of plaintiff's medical condition, and led to an inappropriate course of treatment.[4] Once again, EMTALA does not re-

---

3. The court has permitted such discovery, although to an extent limited in scope.

4. The relevant conclusions set forth in the affidavit are as follow:
 a. The care rendered to the plaintiff on 11/09/91 and 11/11/91 by Dr. Palmerton and Dr. Kim was substandard and represented an incomplete evaluation.
 b. The care rendered to the plaintiff on 11/09/91 and 11/11/91 by Dr. Palmerton and Dr. Kim did not include requisite ancillary services routinely available to Hospitals of similar size and capacity.
 c. If the medical screening provided to plaintiff is the identical screening procedure provided to all patients complaining of the same problems or similar signs and symptoms, the screening provided to such patients is so substandard that it is impossible to characterize any such screening as an appropriate medical screening examination, especially given the size and capacity of this hospital.
 d. An appropriate evaluation of the plaintiff on 11/09/91 would have prompted admission or antibiotics and close follow up which would have prevented the need for multiple chest tubes and thoracic surgery.

quire that healthcare professionals meet any minimum standard of care. Thus, "[w]hile [the affidavit] might be sufficient to survive a summary judgment motion in a medical malpractice case, it is clearly insufficient to survive a motion for summary judgment in an EMTALA case because at no point does [it] present any evidence that [Community Hospital] deviated from its standard screening procedure." *Baber*, 977 F.2d at 882. In *Cleland v. Bronson Health Care Group, Inc.*, the court recognized, in facts more sympathetic than those in the present case, that a screening could be inappropriate with respect to the applicable negligence standard of care, yet appropriate by EMTALA standards:

> In one sense, in hindsight, the screening provided in this case could scarcely be called appropriate. The patient came in, he had a condition that was at least conceivably ascertainable by medical science, the condition was not ascertained, and he died within 24 hours.

917 F.2d 266, 271 (6th Cir.1990).

In this case, defendant has presented unrefuted evidence that it followed its standard screening procedures in treating Richmond. On each occasion, both a nurse and a doctor examined plaintiff, a radiologist x-rayed plaintiff and analyzed those x-rays, and the physician then made a diagnosis and prescribed a course of treatment. The court finds persuasive the application of EMTALA standards in a case with a similar factual and procedural posture:

> In opposing this motion [for summary judgment] the plaintiff has failed to produce any evidence upon which a jury could find the hospital liable under § 1395dd. There is no indication that the hospital knowingly failed to conduct an appropriate medical examination under § 1395dd(a).

To the contrary, the record indicates that within ten minutes of their arrival in the emergency waiting room the Deberrys were seen by a nurse who recorded Shauntia's symptoms. Finding that the child was feverish, a second nurse followed hospital procedures in administering medication to bring down the temperature. Next the Deberrys were seen by [a doctor] who took a history, conducted a physical examination, and ordered a blood test. The fact that [the doctor's] ultimate diagnosis might have been incorrect or even inconsistent with the diagnosis that a reasonable physician under similar circumstances would have made is irrelevant under the civil penalty provision of the antidumping act.

*Deberry*, 769 F.Supp. at 1035. Accordingly, the court finds that it must grant summary judgment as to Count I of plaintiff's complaint.

### B. Counts II and III: Stabilization and Transfer

█ In the present case, the evidence is uncontroverted that no one at Community Hospital detected that plaintiff suffered from an "emergency medical condition," [5] whether or not such a condition existed on either November 9 or 11, 1993. Therefore, plaintiff cannot make out a claim for the violation of EMTALA's stabilization or transfer requirements. *See Baber*, 977 F.2d at 883 (holding that "EMTALA's transfer requirements do not apply unless the hospital actually determines that the patient suffers from an emergency medical condition"); *Gatewood*, 933 F.2d at 1041 (stating that the stabilization and transfer provisions of EMTALA "are triggered only after a hospital 'determines that [an] individual has an emergency medical condition'" (citing 42 U.S.C.

---

e. An appropriate evaluation of the plaintiff on 11/11/91 would have prompted admission and antibacterial coverage which would have prevented the need for multiple chest tubes and thoracic surgery.

**5.** EMTALA defines an "emergency medical condition" as follows:
(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of im-

mediate medical attention could reasonably be expected to result in—
(i) placing the health of the individual ... in serious jeopardy,
(ii) serious impairment to bodily functions, or
(iii) serious dysfunction of any bodily organ or part;
. . . .
42 U.S.C. § 1395dd(e)(1).

§§ 1395dd(b), (c))); *Cleland,* 917 F.2d at 271 (concluding that "if the nature of the condition is not detected, the hospital cannot be charged with failure to stabilize a known emergency condition"). Accordingly, the court must grant the motion for summary judgment as to Counts II and III.

### C. *Count IV: Punitive Damages*

Count IV avers that Richmond is entitled to punitive damages for the alleged EMTALA violations. Since the court today grants the motion for partial summary judgment as to plaintiff's EMTALA claims, it must also grant the motion as to Count IV.

### III. *CONCLUSION*

For the reasons stated, the court finds that it must grant defendant's motion for partial summary judgment as to Counts I, II, III and IV of the complaint. An appropriate order consistent with this memorandum opinion shall be entered this day.

### *ORDER*

By memorandum opinion and order dated April 7, 1995, this court granted defendant Community Hospital of the Roanoke Valley's motion for partial summary judgment as to plaintiff's claims under the Emergency Medical Treatment and Active Labor Act of 1986, 42 U.S.C. § 1395dd. Upon plaintiff's motion, and it appearing otherwise proper, it is

### ADJUDGED AND ORDERED

that this court's April 7, 1995 order be amended to include a statement, pursuant to 28 U.S.C. § 1292(b), that the order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation. It is **FURTHER ORDERED** that the remaining proceedings in this case be and hereby are **STAYED** pending plaintiff's application for appeal.

The Clerk of Court is directed to send certified copies of this order to all counsel of record.