Naquan FISHER, an infant, by his mother and natural guardian Felice FISHER, and Felice Fisher, individually, Plaintiffs,

v.

NEW YORK HEALTH AND HOSPITALS CORPORATION, Raymol Varghese, M.D., Thomas Galloway, M.D., and Junaid Khan, M.D., Defendants.

No. 94–CV–2769 (JG).

United States District Court, E.D. New York.

Jan. 8, 1998.

Kenneth T. Kerner, Kerner & Kerner, New York City, for Plaintiffs.

Theodore Rosenzweig, Corolan E. Magnoli, McAloon & Friedman, P.C., New York City, for Defendants.

*MEMORANDUM AND ORDER*

GLEESON, District Judge.

Plaintiffs, ten year-old Naquan Fisher and his mother, Felice Fisher, seek damages for injuries sustained by Naquan in December 1993. The amended complaint alleges causes of action under the Emergency Medical Treatment and Active Labor Act ("EMTA-LA"), 42 U.S.C. § 1395dd, and a medical

malpractice claim under New York law. The defendants are the New York City Health and Hospitals Corporation ("NYCHHC") and three physicians at Woodhull Hospital in Queens, New York: Raymol Varghese, Thomas Galloway and Junaid Khan.

The defendants have moved for summary judgment on the federal claims. For the reasons set forth below, the motion is granted. The Court will retain jurisdiction over the malpractice claim.

### FACTS[1]

This action arises out of events that began on December 15, 1993, when six-year-old Naquan Fisher got into a snowball fight with his brothers. Naquan was hit over the left eye, causing him to quit the fight and go inside. He stayed home from school the next day, complaining of a headache. A fever developed, and his mother called for an ambulance, which rushed him to the emergency room of Woodhull Hospital in the early morning hours of December 17, 1993.

Naquan was first examined by an emergency room triage nurse at approximately 12:30 a.m. His vital signs were taken, revealing a temperature of 104.6°. The nurse was told by Naquan's mother that he had been hit in the head one or two days earlier, and had been suffering from headaches ever since. Naquan also complained of loss of appetite and generalized body pain. At approximately 1:00 a.m., he was given 180 mg of Tylenol to reduce his fever. The triage form calls upon the nurse to categorize the patient as "routine," "high priority" or "emergent." The nurse characterized Naquan's condition as "high priority."

At approximately 1:15 a.m., Dr. Thomas Galloway, an attending physician in Woodhull Hospital's Department of Emergency Medicine, performed a pediatric examination of Naquan, which did not reveal to Galloway any abnormal findings with regard to the boy's heart, lungs, skin, head, eyes, ears, nose or throat. Naquan was active and alert, his lungs were clear, and he had no signs of acute respiratory distress. The initial diagnosis by Galloway was that Naquan suffered from a viral illness.

At approximately 2:20 a.m., Galloway re-evaluated Naquan and found him to be in stable condition. His fever had dropped to 102°. Naquan was thus discharged from the hospital into the care of his mother, with instructions to administer Tylenol and fluids every four hours and a referral to the pediatric clinic.

Three days later, on December 20, 1993, Naquan returned to Woodhull Hospital's emergency room with a continued high-grade fever, general body aches, severe headaches, loss of appetite, shakes and chills. At that time, he was evaluated and admitted into the pediatric ward, where he came under the care of Drs. Varghese and Khan.[2] Naquan was diagnosed as suffering from appendicitis. On December 22, 1992, however, a laparotomy disclosed a normal appendix. The post-operative diagnosis was pyrexia (high fever) of unknown origin. Finally, on December 27, 1993, a CT scan was performed on Naquan, revealing a severe brain abscess. Naquan was then rushed to Kings County Hospital, where he was diagnosed with a severe festering brain abscess, subdural bilateral empyemas and epidural hematoma. Emergency brain surgery was performed to evacuate the hemorrhage. Naquan remained at Kings County Hospital for most of January 1994. As a result of the surgery, he is missing part of his skull and he must wear a hard hat for protection. He suffers from neurological, motor, behavioral and emotional damage.

In support of their federal claims under the EMTALA statute, plaintiffs allege that the hospital and Dr. Galloway failed to adequately screen Naquan when he came into the emergency room and failed to stabilize him before releasing him. Defendants contend first that there can be no claim against Galloway personally because EMTALA's private right of action is limited to claims against hospitals. Defendants further argue

---

**1.** Because this is a motion for summary judgment, the facts are set forth in the light most favorable to the plaintiffs, the party opposing the motion.

**2.** Drs. Varghese and Khan did not participate in the emergency room care or treatment of Naquan, and are named as defendants only in the malpractice claim. See Kerner Affidavit ¶ 21.

there can be no EMTALA liability in this case on the part of the hospital. Even if there was a misdiagnosis, they contend, Naquan received the screening and stabilization to which he is entitled under the statute.

## DISCUSSION

### A. The Summary Judgment Standard

Summary judgment must be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining when material facts are in dispute, all ambiguities must be resolved and all inferences drawn in favor of the non-moving party. *Local 74, Service Employees International Union v. Ecclesiastical Maintenance Services*, 55 F.3d 105, 108 (2d Cir.1995).

The burden is upon the moving party to demonstrate the absence of any genuine issues of material fact. *Gallo v. Prudential Residential Services, Ltd.*, 22 F.3d 1219, 1223 (2d Cir.1994). That burden may be met by showing that "little or no evidence may be found in support of the nonmoving party's case." *Id.* "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). The non-moving party cannot survive a properly supported motion for summary judgment by resting on his pleadings "without 'any significant probative evidence tending to support the complaint.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

### B. The EMTALA Statute

EMTALA was enacted in 1986 "in response to a growing concern that hospitals were 'dumping' patients unable to pay, by either refusing to provide emergency medical treatment or transferring patients before their emergency conditions were stabilized." *Brooks v. Maryland General Hospital, Inc.*, 996 F.2d 708, 710 (4th Cir.1992). It provides, in pertinent part:

(a) Medical screening requirement

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

(b) Necessary stabilizing treatment for emergency medical conditions and labor

(1) ... If any individual ... comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition; or

(B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

42 U.S.C. §§ 1395dd(a) and (b)(1) (1997). The statute defines an "emergency medical condition" as:

a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

448

(i) placing the health of the individual ... in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part ...

42 U.S.C. § 1395dd(e)(1)(A)(1997).

With respect to an aggrieved individual's private right of action, EMTALA provides:

(A) Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

42 U.S.C. § 1395dd(d)(2)(A) (1997).

■ In order to state a claim under EMTALA, a plaintiff must allege that he went to the emergency room of a participating hospital seeking treatment for a medical condition, and that the hospital either did not adequately screen him to determine whether he had an emergency medical condition, or discharged or transferred him before such a condition had been stabilized. Here, defendants do not dispute that Woodhull Hospital, which is operated and controlled by the defendant NYCHHC, is a participating hospital covered by EMTALA. Nor is there any meaningful dispute over the fact that Naquan arrived at Woodhull's emergency room seeking treatment for a medical condition. The issues before me are (1) the legal question whether there can be individual liability on the part of the treating doctor, and (2) whether there exist any genuine issues of material fact regarding (i) the appropriateness of the screening procedure provided to Naquan and (ii) whether he was discharged without first having been stabilized.

C. *The Individual Liability of Physicians Under EMTALA*

■ Most courts that have addressed the issue have found that EMTALA does not create a private cause of action against individual physicians. *See, e.g., Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1256 (9th Cir.1995), *King v. Ahrens*, 16 F.3d 265, 271 (8th Cir.1994); *Delaney v. Cade*, 986 F.2d 387, 393–94 (10th Cir.1993); *Baber v. Hospital Corporation of America*, 977 F.2d 872, 876–878 (4th Cir.1992); *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1040 n. 1 (D.C.Cir.1991). I agree.

The text of the statute virtually precludes the implication of a private right of action against physicians. Congress obviously considered enforcement mechanisms against participating hospitals and physicians, and chose to provide a private right of action against only hospitals, 42 U.S.C. § 1395dd(d)(2)(A), while authorizing the Secretary of Health and Human Services to proceed administratively against both hospitals and physicians. 42 U.S.C. §§ 1395dd(d)(1) & (2)(B). There is no support on the face of the legislation for upsetting that determination by allowing aggrieved persons to sue emergency room physicians.

The legislative history confirms that Congress intentionally limited the private action to claims against hospitals. An earlier draft of the provision, which simply granted patients a cause of action, was rejected because it "did not precisely identify which parties could bring actions under the provisions, nor did it identify those against whom they could bring such action." H.R.Rep. No. 241, 99th Cong., 1st Sess., pt. 3, at 6 (1986), *reprinted in* 1986 U.S.C.C.A.N. at 42, 579, 728. The Committee Report stated that amending the provision to its present language "clarifies that actions for damages may be brought only against the hospital which has violated the requirements of § 124." *Id.* at 6–7, *reprinted at* 1986 U.S.C.C.A.N. at 728; *see also Baber*, 977 F.2d at 877.

Plaintiffs cite *Sorrells v. Babcock*, 733 F.Supp. 1189 (N.D.Ill.1990), which allowed a patient to sue an emergency room physician under EMTALA. *Sorrells* has been roundly criticized, *see e.g., Eberhardt*, 62 F.3d at 1256, and rightly so, as it fails to give meaning to the difference between a private action for damages and administrative enforcement. *See Sorrells*, 733 F.Supp. at 1193; *Baber*, 977 F.2d at 878.

Since the statute does not provide for a private cause of action against physicians, summary judgment is granted with respect to the EMTALA claims asserted against Dr. Galloway.

### D. *NYCHHC'S Motion*

The NYCHHC argues that summary judgment should be granted for it on the EMTALA claims because the undisputed facts require the conclusion that there was no violation of the statute in connection with the treatment and release of Naquan Fisher. I agree.

#### 1. *The Screening Examination*

■ EMTALA requires that a participating hospital provide " an appropriate medical screening examination" to all who come to its emergency room seeking medical assistance. 42 U.S.C. § 1395dd(a). The statute does not define that phrase except to state that the purpose of the examination is to determine whether an "emergency medical condition" exists. However, the legislative history of the statute and the case law applying it are helpful.

■ As noted above, EMTALA was enacted to prohibit discrimination among patients by hospital emergency rooms. As a result, the courts that have interpreted the phrase "appropriate medical screening examination" have held it to mandate treatment that is equal, as opposed to treatment that meets professional standards of competence. Thus, a hospital fulfills the appropriate screening requirement "when it conforms in its treatment of a particular patient to its standard screening procedures. By the same token, any departure from standard screening procedures constitutes inappropriate screening in violation of [EMTALA]." *Gatewood*, 933 F.2d at 1041. The appropriateness of the screening examination is determined by reference to how the hospital treats other patients who are perceived to have the same medical condition. If patients who are perceived to have viral illnesses are screened similarly by the hospital, EMTALA has not been violated. That is true even if the hospital's perception of a particular patient is based on a misdiagnosis; EMTALA is implicated only when individuals who are perceived to have the same medical condition receive disparate treatment. *Vickers v. Nash General Hospital, Inc.*, 78 F.3d 139, 143 (4th Cir.1996); *see also Summers v. Baptist Medical Center*, 91 F.3d 1132, 1139 (8th Cir.1996).

■ In other words, EMTALA is not a federal medical malpractice statute. *Repp v. Anadarko Municipal Hospital*, 43 F.3d 519, 522 (10th Cir.1994); *Power v. Arlington Hospital Ass'n.*, 42 F.3d 851, 856 (4th Cir.1994). Since it was not enacted to remedy negligent diagnosis, *see, e.g., Holcomb v. Monahan*, 30 F.3d 116, 117 (11th Cir.1994), only refusals to follow regular screening procedures violate the statute. Faulty screening in a particular case, as opposed to disparate screening or refusing to screen at all, does not violate the statute. *Correa*, 69 F.3d at 1192.

Plaintiffs do not contend that Woodhull Hospital refused to treat Naquan, as was the case in *Correa*. *See* 69 F.3d at 1189. Nor do they argue that Naquan's screening examination deviated from the type of examination normally performed at Woodhull Hospital on patients with similar symptoms. Rather, plaintiffs contend that "questions of fact exist as to whether defendants provided appropriate medical screening" for the reasons stated in the affidavit of Irving Friedman, M.D., plaintiffs' expert witness. Plaintiffs' Memorandum at 7. Dr. Friedman's affidavit, however, states only that the treatment of Naquan fell below acceptable medical practice and emergency medical care.

■ In short, the only respect in which the screening examination is said to be non-uniform is nothing more than an accusation of negligence. I accept for the purposes of this motion that Dr. Galloway was negligent in his failure to order blood tests, x-rays and other diagnostic tests, but that will not sustain a claim under EMTALA. *See Summers v. Baptist Medical Center of Arkadelphia*, 91 F.3d 1132, 1138 (8th Cir.1996).

Plaintiffs' reliance on *Brodersen v. Sioux Valley Memorial Hospital*, 902 F.Supp. 931 (N.D.Iowa 1995), is misplaced. In that case, a question of fact was raised concerning whether the hospital's standard screening ex-

amination for "patients who present with chest pain was followed *in this instance.*" *Id.* at 943 (emphasis added). Here, the defendant has asserted that it treats all similarly situated patients uniformly, and that Naquan did not receive disparate treatment. Plaintiffs describe that assertion as self-serving, but they fail to refute it.

Finally, plaintiffs argue that if I accept defendants' contention that all EMTALA requires is uniform treatment, then hospitals could avoid all liability under the statute by the simple expedient of implementing uniform, cursory and substandard screening procedures. This argument does not concern me. Compliance with EMTALA is not a defense to a malpractice claim, and I expect that even if a hospital were sufficiently venal that it would consider endangering its emergency room patients in this way, it would not likely risk exposure to state law malpractice claims by implementing shoddy across-the-board screening examinations. Moreover, the statute requires "appropriate" screening examinations, and even if that term is not interpreted to apply ordinary standards of care, it could well, in an appropriate case, be held to proscribe even uniform screening examinations that are so substandard as to amount to no screening at all. *See Baber,* 977 F.2d at 879 n. 7.

Based on the absence of any evidence of disparate treatment, summary judgment is appropriate on the screening question. When no rational jury could find in favor of the nonmoving party because the evidence is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper. *See also Holcomb v. Monahan,* 30 F.3d 116, 117 (11th Cir.1994) (summary judgment for defendants on screening issue where no evidence suggested that hospital treated patient differently from other patients); *Gatewood,* 933 F.2d at 1041 (summary judgment for defendants on screening issue where plaintiff conceded that patient received a screening examination and did not allege that it differed in any respect from that generally employed by hospital). Accordingly, defendants' motion for summary judgment is granted with respect to the plaintiffs' claim of inadequate screening.

### 2. *The Stabilization Requirement*

Plaintiffs also apparently claim that the hospital and Dr. Galloway violated the "stabilization" requirement in EMTALA. I find that this claim, which has received only scant attention in the parties' memoranda, is insufficient as a matter of law.

The undisputed facts reveal that Dr. Galloway's initial pediatric examination at 1:15 a.m. was followed by a re-evaluation at 2:20 a.m. The latter examination revealed to Dr. Galloway that Naquan was in stable condition, and that his temperature had fallen to 102°. In those circumstances, no rational juror could find a failure "to stabilize" Naquan, as that term is defined in U.S.C. § 1395dd(e)(3). Having screened, treated and apparently stabilized Naquan before discharging him, the defendants cannot be found to have violated the EMTALA statute.

### E. *The Malpractice Claim*

Having dismissed the only federal claims, I have discretion to dismiss the supplemental malpractice claim as well. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). However, these claims are not required to be dismissed, *see, e.g., Palmer v. Hospital Authority of Randolph County,* 22 F.3d 1559, 1567–68 (11th Cir.1994), and there are good reasons not to do so here. First, this action was filed in 1994. The inevitable delay in the resolution of the remaining dispute that would follow a remand to state court would be especially inappropriate here, where an infant plaintiff continues to suffer from the alleged malpractice. Second, both sides want the case, in which discovery is now complete, to remain in this federal court.

Accordingly, I will retain supplemental jurisdiction over the state law malpractice claims. A trial date will be set at a status conference that will be held on January 23, 1998, at 11:30 a.m.

So Ordered.