Joyce A. HUTCHINSON, Plaintiff,

v.

GREATER SOUTHEAST COMMUNITY HOSPITAL, et al., Defendants.

Civ. A. No. 91–2436 (CRR).

United States District Court, District of Columbia.

May 28, 1992.

William P. Lightfoot, Paulette E. Chapman of Koonz, McKenney, Johnson & Regan, Washington, D.C., for plaintiff.

Nicholas S. McConnell, Arthur D. Burger of Jackson & Campbell, Washington, D.C.,

Stephen L. Altman and Vicki J. Hunt of Montedonico, Hamilton, Altman, Fairfax, Va., for defendants.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

Pursuant to Rule 16 of the Federal Rules of Civil Procedure, the Court held a status conference and motions hearing in the above-captioned action on May 26, 1992. The defendants initially filed Motions to Dismiss or, in the Alternative, for Summary Judgment. On April 24, 1992, the Court denied the Motion to Dismiss, allowed plaintiff the opportunity to conduct further discovery relevant to the Motions for Summary Judgment, and set a schedule for the submission of supplemental memoranda. *See* Order filed April 27, 1992. Discovery has now been completed, and the Court has received the parties' supplemental filings. Upon careful consideration of the submissions of the parties, the arguments of counsel, the applicable law, and the entire record herein, the Court concludes that the defendants' Motions for Summary Judgment must be granted.

### I. *Background*

Plaintiff alleges that on September 28, 1990, at about 4:22 a.m., the decedent Willie Joe Hunter was transported by ambulance to Greater Southeast Community Hospital in Washington, D.C. He complained of pains to the back of his head, foam in his mouth, weakness and headaches. He was examined by Dr. Kenneth Larsen, a board-certified specialist in emergency medicine and chair of the GSCH Emergency Department, who assessed his condition as "non-emergent". The decedent was then placed in a taxicab to be transferred to the District of Columbia General Hospital. At approximately 8:30 a.m., on September 28, 1990, District of Columbia Metropolitan Police officers picked up the decedent half-clothed, aimlessly wandering the streets, unable to speak comprehensibly and staggering into traffic. He was admitted at District of Columbia General Hospital, where a CT scan showed subarachnoidal hemorrhage.

On October 2, 1990 Mr. Hunter died of a subarachnoidal hemorrhage.

The plaintiff brings this action individually and as personal representative of the estate of Willie Joe Hunter, her deceased husband. She sues defendants Greater Southeast Community Hospital ("GSCH"), the GSCH Corporation, and the Southeast Emergency Physicians Group, P.C., for violating the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd (the "Emergency Act") and for medical negligence under survivorship and wrongful death theories. There is no diversity jurisdiction in this case, so the sole basis for federal jurisdiction is the Emergency Act.

The defendants contend that there was no violation of the Federal Emergency Act; therefore the federal count must be dismissed on the merits and the pendent claims must be dismissed for lack of jurisdiction.

### II. *Analysis*

Rule 56(c) of the Federal Rules of Civil Procedure requires that the Court grant a motion for summary judgment if the pleadings and supporting affidavits and other submissions "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). However, it is well established that the Court must believe the non-movant's evidence and draw all justifiable inferences in her favor. *Id.* at 255, 106 S.Ct. at 2513–14.

The Emergency Medical Treatment and Active Labor Act provides in relevant part that

if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a

medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

42 U.S.C. § 1395dd(a).

The D.C. Circuit has clarified the meaning of "appropriate medical screening":

The Act is intended not to ensure each emergency room patient a correct diagnosis, but rather to ensure that each is accorded the same level of treatment regularly provided to patients in similar medical circumstances. Thus, what constitutes an "appropriate" screening is properly determined not by reference to particular outcomes, but instead by reference to a hospital's standard screening procedures.

*Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C.Cir.1991).

 The statute does not incorporate a malpractice or negligence standard available under state law. Therefore, a negligent misdiagnosis does not state a claim under the Act. *Id.* Rather, the cause of action arises for "what amounts to failure to treat". *Id.* Thus to prevail, plaintiff must show that the defendants departed from their standard screening procedures in their treatment of the decedent. *See id.*

The GSCH policy on emergency care provides that "[c]are to patients with true emergencies is available regardless of place of residence or ability to pay". Southeast Emergency Physicians Group, P.C. ("Physicians") Supp. Reply, Tab A at 1. Pursuant to standard policy, a patient who appears at the GSCH Emergency Department is first evaluated by triage personnel (medical technicians), who take a brief history and designate the patient as either emergent or routine. Pl.Supp.Opp.,

Tab 2 at 1. If the patient is designated "routine", is uninsured and has no cash deposit (the decedent fit this description), he or she will be:

seen by an emergency physician for a screening exam to determine if a medical emergency exists. Those patients whom the physician determines may have a medical emergency will be treated. Those patients whom the physician determines do not have a medical emergency will be denied care but will be offered transportation to other treatment sites.[1]

Pl.Supp.Opp., Tab 2 at 2.

According to Dr. Raymond W. Turner, the Vice President of Medical Affairs of GSCH, there are no hospital policies, protocols, or procedures specifying any required content of an emergency screening exam, or describing what comprises an adequate or inadequate screening exam. Physicians' Supp. Reply, Tab B at 52–58, 64–65.

The medical record in this case indicates that a medical technician recorded the decedent's identification information, date and arrival time, and described his complaint as "Pains to back of head, Foam in mouth, weak. Accord[ing]—to p[atien]t." The patient's temperature, pulse, respirations, and blood pressure were recorded, and his disposition was indicated as routine. Physicians' Mot. for Summary Judgment or to Dismiss, Att. D. The medical technician, Napoleon Lechoco, Jr., indicated at his deposition that the patient's vital signs were within normal limits, and that the information he recorded was received from the patient. GSCH Amended Statement of Material Facts, Tab 1 at 85, 89.

Dr. Larsen, the treating physician, added the following notations to the medical record upon his examination of the patient:

c/o feels bad, headache, weak.
nonemergent.
cab to DCGH.

Physicians' Mot. for Summary Judgment or to Dismiss, Att. D.

---

1. Uninsured patients without a cash deposit who are deemed "routine" after triage and complain only of "venereal disease, sore throat with no fever, poison ivy, suture removal, or lice, or who only want a pregnancy test" may be denied care after triage and before the physician's screening exam. Pl.Supp.Opp., Tab 2 at 2. The decedent in this case did not fall into this category.

Dr. Larsen states in an affidavit that he discussed with Mr. Hunter his complaints, conducted a physical examination and determined that his condition was not an emergency. Physicians' Mot. for Summary Judgment or to Dismiss, Att. B. He also states that after determining that the decedent's condition was not an emergency, he advised him that he could either return with a deposit for additional medical services, or, if he preferred to be seen immediately, the hospital would pay for a taxicab to D.C. General Hospital. *Id.* During his deposition, based on his independent recollection, Dr. Larsen described the examination he conducted and explained his conclusion that the patient's condition was not an emergency. He testified that he took a history of complaints, performed a gross neurologic examination to rule out emergency conditions such as intracranial bleed or meningitis, and concluded that the patient had a mild upper respiratory infection. Physicians' Supp. Reply, Ex. D at 83, 87–89. 116–17. He stated that the results of this examination are documented by his written conclusion that the patient was "non-emergent." *Id.* at 89–90. Moreover, he averred that his examination and screening would have been the same regardless of the patient's insured status; if the patient had demonstrated the ability to pay for care, Dr. Larsen would have "written him a prescription for antihistamines and sent him home." *Id.* at 118–19.

The defendants argue that they have demonstrated that the decedent was screened first by the medical technician, who deemed his condition routine, and then received a screening examination from Dr. Larsen, who concluded that his condition was non-emergent and arranged for his transportation to D.C. General Hospital. Therefore, they argue, the hospital's standard screening procedures were followed and there was no violation of the Emergency Act.

The plaintiff makes a valiant attempt to find a genuine dispute as to a material fact in this regard. She argues that the hospital's Emergency Department has a charting policy, which requires the maintenance of certain documentation in the Emergency Department. Pl. Supp. Opp., Tab 2 at 3. She cites Dr. Turner's deposition testimony that there are policies regarding proper documentation of a screening exam which provide that:

> the elements of the exam that's documented have to include aspects of the history, the observations or the physical exam that the physician does, his conclusions and whether or not it's an emergency case or not and what his advice to the patient is.

Physicians' Supp. Reply, Tab B at 68. Dr. Turner went on to state that this policy as to documentation does *not* ("strictly speaking") constitute a policy as to what constitutes an adequate screening exam, although it could represent a minimum threshold for a screening exam. *Id.* at 68–69.

Plaintiff argues that Dr. Larsen failed to comply with required documentation procedures, because his record of the screening examination does not document all of the tests he performed and conclusions he reached. Therefore, she argues, it may be inferred that he did not perform the examination he claims he performed, and that he did not provide the sort of screening he would provide to similarly situated patients who had insurance. She also contends that she is entitled to challenge the credibility of Dr. Larsen via live testimony at trial.

■ These arguments are without merit. The Emergency Act does not require any particular documentation of the screening examination. Therefore deviance from any documentation requirements does not, in itself, constitute a violation of the Emergency Act. Neither is any incompleteness in the record sufficient to support an inference that in conducting his screening examination, Dr. Larsen deviated from GSCH's standard screening procedures and conducted an inappropriate screening examination. Construing Dr. Turner's testimony in the light most favorable to the plaintiff, it can be argued that a standard screening examination would include aspects of the patient's history, the physician's observations, his conclusions, and his advice to the

patient.[2] Physicians' Supp. Reply, Tab B at 68. The scanty medical record of Dr. Larsen's screening examination does not include details regarding his observations and conclusions, which, arguably, would be part of a standard screening examination. However, Dr. Larsen testified at length during his deposition about his observations and conclusions during his screening of the decedent, and the medical record is not inconsistent with Dr. Larsen's testimony.

Plaintiff's contention that the medical record supports an inference that Dr. Larsen did not examine the decedent as he claims he did is merely speculative. There is no evidence that Dr. Larsen's medical record of the screening examination of another similarly situated patient would have been any different. Its brevity offers no evidence one way or another as to the content of the screening examination.[3] The plaintiff's inability to independently confirm or rebut Dr. Larsen's testimony as to the content of his screening examination does not create a genuine dispute as to a material fact.

Accordingly, the court concludes that the defendants have shown that there was no violation of the Emergency Act. The evidence demonstrates that the hospital's standard screening procedures were followed in this case; the decedent was treated no differently than another patient in similar medical circumstances would have been treated. Whether that treatment was consonant with the applicable standard of care is an issue this Court need not reach, as the jurisdiction to consider it lies with the Superior Court of the District of Columbia.

The Court notes that its conclusion here does not preclude relief under the Emergency Act in other cases. The total absence of a record that a patient received a screening examination by a physician would support a claim of an Emergency Act violation. Similarly, as defense counsel pointed out, if there were evidence that a case involved a physical complaint for which some specific screening procedure, such as, for example, an X-ray, would normally be used, and was not used, that evidence would support a claim under the Emergency Act. By contrast, in this case, there is no evidence that Dr. Larsen failed to perform any standard diagnostic procedure mandated by plaintiff's specific complaints. Nor is there any other evidence from which a legitimate inference can be drawn that the decedent was treated any differently from similarly situated patients.

### III. *Conclusion*

For all of the reasons previously stated herein, the Court shall grant the defendants' Motions for Summary Judgment. There are no genuine disputes as to material facts regarding the federal Emergency Medical Treatment and Active Labor Act claim, and defendants are therefore entitled to judgment as a matter of law. The Court shall also dismiss the remaining pendent negligence claims, because there is no

---

2. This conclusion, based on Dr. Turner's comments about the documentation policy, is highly questionable because, as cited above, when asked directly whether there were any standard procedures which would constitute a screening exam, Dr. Turner stated that there were no such standards. Physicians' Supp. Reply, Tab B at 52–58, 64–65.

Plaintiff also argues, based on the charting policy and Dr. Turner's deposition, that there are even more required elements of the standard screening examination. *See* Pl.Supp.Opp. at 5; Tab 2 at 3; Tab 3 at 51, 58. There is very little evidence linking the charting policy to the screening examination. Dr. Larsen, in fact, flatly stated that he did not believe that there is any connection between the charting policy and screening examinations. Physicians' Supp. Reply, Tab C at 57–58. Even if, *arguendo*, the charting requirements apply to physicians conducting screening examinations, as explained above, any alleged deficiencies are irrelevant to the Emergency Act claim.

3. Similarly, plaintiff makes much out of Dr. Turner's statement that he was unable to determine whether Dr. Larsen's screening examination was appropriate by looking at the medical record, because the record lacks sufficient detail. *See* Pl.Supp.Opp., Tab 3 at 97–100. Even if this testimony were admissible at trial (which is doubtful), it would not be probative. Dr. Turner simply was unable to state one way or another whether, based on the medical record, the screening examination was appropriate. He did not contend that it was in any way inappropriate.

basis for federal jurisdiction as to those claims. Therefore, this entire case shall be dismissed from the dockets of this Court.

The Court shall enter an appropriate Order on this date consistent with the foregoing Memorandum Opinion.

### ORDER

In accordance with the Court's Memorandum Opinion entered in the above-captioned case on this date, it is, by the Court, this 28 day of May, 1992,

ORDERED that the defendants' Motions for Summary Judgment shall be, and hereby are, GRANTED; and it is

FURTHER ORDERED that the above-captioned case shall be, and hereby is, DISMISSED from the dockets of this Court.