Ilianita **SANCHEZ RIVERA,** et al., Plaintiffs,

v.

**DOCTORS CENTER HOSPITAL, INC.,** et al., Defendants.

No. CIV. 01–2713(JP).

United States District Court, D. Puerto Rico.

Feb. 25, 2003.

---

Rafael E. García Rodón, Esq., San Juan, for Plaintiff.

Raphael Peña Ramón, Esq., Enrique Nassar–Risek, Esq., Humberto Vázquez Sandoval, Esq., Iván Domínguez, Esq., San Juan,. for Defendant.

## OPINION AND ORDER

PIERAS, Senior District Judge.

## I. INTRODUCTION

The Court has before it Defendant Doctors Center Hospital's Motion for Sum-

mary Judgment (**docket No. 52**)[1], and Plaintiffs' opposition thereto (docket No. 61). Plaintiffs Ana Rivera, Tomás Molina, Giovanna Molina, and Cristal Molina (hereinafter "Plaintiffs")[2] bring forth this action under the Emergency Medical Treatment and Active Labor Act, known as "EMTALA", alleging negligent screening and transfer of their son and brother, Gian Javier Molina Rivera, who died after he was brought to Doctors Center Hospital in Manatí, Puerto Rico, after being involved in a violent car accident. Plaintiffs also bring forth causes of action for negligence under Article 1802 of the Puerto Rico Civil Code. For the reasons herein stated, Defendant's Motion for Partial Summary Judgment is hereby **GRANTED**, and Plaintiffs Ana Rivera, Tomás Molina, Giovanna Molina, and Cristal Molina's EMTALA claims are hereby **DISMISSED WITH PREJUDICE**. However, the Court is unclear whether Plaintiffs are suing the hospital alone or are also suing Dr. Javier Rodríguez and Dr. John Psarras Castro. Therefore, it will defer its decision whether to exercise jurisdiction over Plaintiffs' remaining state law claims until this matter has been cleared up.

## II. STANDARD

Summary judgment serves to "assess the proof in order to see whether there is a genuine need for a trial." *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir. 1990). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is in order when the record, including "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," and viewed in the light most favorable to the nonmoving party, [in this case Plaintiffs] "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Zambrana–Marrero v. Suárez–Cruz,* 172 F.3d 122, 125 (1st Cir.1999) (stating that summary judgment is appropriate when, after evaluating the record in the light most favorable to the non-moving party, the evidence "fails to yield a trial worthy issue as to some material fact"); *Goldman v. First National Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993); *Canal Insurance Co. v. Benner,* 980 F.2d 23, 25 (1st Cir.1992). A fact is material if, based on the substantive law at issue, it might affect the outcome of the case. *See Mack v. Great Atl. and Pac. Tea Co., Inc.,* 871 F.2d 179, 181 (1st Cir. 1989). The Supreme Court has stated that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

In a summary judgment motion, the movants, in this case Defendants, bear the initial burden of "informing the district court of the basis for their motion and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celo-*

---

1. Defendant's Motion is really only a motion for partial summary judgment, since Defendant did not address the causes of action for malpractice brought under diversity by the decedent's relatives living in Pennsylvania and Florida.

2. Gian Javier's relatives living in Pennsylvania and Florida, Ilianita Sánchez Rivera, Fé-

lix Rivera Guerrero and María Molina Rodríguez, are also Plaintiffs in this cause of action, but have only brought forth causes of action against Dr. Rodríguez and Dr. Psarras under Puerto Rico law for negligence. They have raised no EMTALA claims, and therefore, are not part of the Court's analysis of this particular issue.

*tex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Where the movant does not bear the burden of proof at trial, it must show that no reasonable fact-finder could find that the non-movant, in this case, the Plaintiffs, have established the requisite elements of their claim. *Id.* at 325, 106 S.Ct. 2548. Once the moving party meets his burden of proof, the burden shifts to the non-movant, who may not "rest upon mere allegations or denials of . . . the pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Goldman,* 985 F.2d at 1116; *see Celotex,* 477 U.S. at 324, 106 S.Ct. at 2554; *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2511. In view of this standard and after studying the parties' briefs and the documents attached thereto, the Court makes the following findings of fact.

## III. FINDINGS OF FACT

1. On July 3, 2000, around 4:15 p.m., Gian Javier Molina Rivera was involved in a violent motor vehicle accident.

2. The accident occurred at Road 685, km 6.5, Manatí, Puerto Rico.

3. The car was being driven by minor Elliot Rosario Morales.

4. Gian Javier was a passenger in the car.

5. Both minors received multiple body traumas.

6. Driver Elliot Rosario died at the scene of the accident.

7. Around 5:00 p.m., 15 year old Gian Javier was brought in an ambulance by state paramedics to the emergency room of Doctors Center Hospital.

8. According to the paramedic's report, the ambulance was called at 4:39 p.m.

9. The ambulance arrived at the scene at 4:44 p.m., departed at 4:50 p.m., and arrived at the emergency room at 4:55 p.m.

10. The record indicates that Gian Javier arrived at the emergency room with multiple traumas, including left otorrhagia, left ear wound, head trauma, left femur displaced fracture, traumatic amputation of the distal portion of the left second finger, peroneal fracture, and was not responding to verbal or pain stimuli.

11. Gian Javier was unconscious upon his arrival at the hospital.

12. His neurological condition was recorded as Glasgow 5, with bilateral midriasis.

13. Gian Javier's condition was a very serious medical emergency condition.

14. Gian Javier was evaluated by Dr. Jorge Rodríguez, the internist and emergency room physician.

15. Dr. Rodríguez' initial diagnosis was: head trauma, pelvis trauma with hematuria, left displaced femoral fracture, left second finger distal partial amputation, suspected left hand phalangeal fracture, left ear auricle wound, otorrhagia and comatose state Glasgow 5.

16. At 5:10 p.m., Dr. Rodríguez ordered cardiac monitoring, endotracheal intubation, oxygen therapy, new peripheral vein canalization, IV fluids with normal saline solution and ringer lactate to run full drip, foley catheter, reduction and traction of the left femoral fracture, laboratories (CBC, arterial blood gases, coagulation test, chemistry test, type and cross match), x-ray (chest, skull, left leg and KUB),

Manitol and Decadron, Tetanus Toxoid, antibiotic IV, mechanical ventilation, brain CT Scan, Narcan, nasogastric tube and gastric lavage.

17. A foley catheter was placed on Gian Javier and it showed a gross hematuria, which is a profuse bleeding through the urethra.

18. Gian Javier was a poly-traumatized patient.

19. At 6:05 p.m. Dr. Rodríguez formally consulted with Dr. Peter Psarras, a surgeon, regarding the need for surgical intervention at that moment.

20. Dr. Psarras decided not to operate on Gian Javier, and recommended he be transferred to Puerto Rico Medical Center ("Centro Médico") for neuro-surgical, orthopaedist, and general surgeon evaluation, and treatment at 6:15 p.m.

21. Both doctors stated as their diagnosis that Gian Javier had a soft, depressible abdomen, which is normal and does not present the possibility of an internal rupture.

22. At the time Gian Javier was treated by Doctors Center Hospital, the hospital did not have the facilities for neurosurgery.

23. A CBC was performed upon arrival and no other CBC was ordered.

24. The nursing personnel did not take Gian Javier's vital signs every 15 minutes, but instead did so approximately every 20–30 minutes.

25. The Protocol for poly-traumatized patients required the execution of the necessary arrangements in order to transfer a poly-traumatized patient to the trauma unit of Centro Médico.

26. Dr. Rodríguez consulted with Dr. Maldonado from Centro Médico, and Dr. Maldonado accepted Gian Javier as a patient for surgery screening.

27. Doctors Center Hospital arranged for the transfer of the patient to Centro Médico by air ambulance at 7:45 p.m.

28. Aeromed has a physician performing duties as "medical control", who evaluates the transfer requests pursuant to his medical judgment, based on what the physician treating the patient indicates.

29. Dr. Benjamin Rodríguez, who served as medical control on the evening in question, recommended that Gian Javier be immediately transferred to Centro Médico.

30. Two units of packed red blood cells were ordered, and were available.

31. The blood was never administered to Gian Javier.

32. Dr. Benjamin Rodríguez opined that the administration of the blood to Gian Javier at Doctors Center was going to delay the transfer, and recommended the blood be sent with Gian Javier to the Centro Médico to be administered there.

33. The transfer was accepted by the Puerto Rico Medical Center.

34. The transfer order written by Dr. Rodríguez at 7:15 p.m. indicated head trauma, pelvic trauma, gross hematuria, left femoral fracture and hypovolemic shock.

35. At 8:30 p.m., moments before the time Gian Javier was placed in the Aeromed air ambulance, his blood pressure was 135/62, within acceptable limits.

36. Gian Javier's mother signed the authorization for the transfer.

37. Doctors Center Hospital had the facilities and the personnel necessary to conduct an abdominal surgery.

38. The air ambulance (Aeromed) arrived at 7:45 p.m. at Doctors Center, and departed at 8:45 p.m.

39. The two units of blood were sent with Gian Javier to Centro Médico.

40. A patient cannot receive a blood transfusion during air transport.

41. A physician did not accompany Gian Javier during transport.

42. Gian Javier died after his arrival at Céntro Medico.

43. Gian Javier's autopsy revealed abrasions in different external body parts, partial amputation of second distal finger of the left hand, left femur fracture, thoracic muscle contusion, pulmonary contusion, fracture of the seventh right rib, liver laceration, left kidney laceration, spleen laceration and hemoperitoneum.

44. The cause of death was classified as severe corporal trauma.

45. Doctors Center Hospital is a Medicare recipient and subject to EMTALA provisions.

## IV. CONCLUSIONS OF LAW

### A. *Screening and Treatment*

■ The Emergency Medical Treatment and Active Labor Act, better known by its acronym, "EMTALA," imposes three duties which "reside in three principal statutory silos." *López–Soto v. Hawayek,* 175 F.3d 170, 172 (1st Cir.1999). The first duty, codified in subsection (a) of the statute, requires that covered hospitals perform "an appropriate medical screening examination" on "any individual" who comes to an emergency department for treatment. 42 U.S.C. § 1395dd(a). The duty to screen applies only in cases of individuals who arrive at the hospital's emergency room. *See López–Soto,* 175 F.3d at 173.

■ In order to be able to determine whether a hospital has complied with its duty to screen a patient, the particular hospital's capabilities must be taken into account. *See Brooks v. Maryland Gen'l Hosp., Inc.,* 996 F.2d 708 (4th Cir.1993). Although the statute is not clear in defining what an appropriate medical screening is, case law has defined this duty as providing an examination "reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints." *Correa v. Hospital San Francisco,* 69 F.3d 1184, 1192 (1st Cir.1995); *see also Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1039 (D.C.Cir.1991) ("'appropriate' screening is properly determined not by reference to particular outcomes, but instead by reference to a hospital's standard screening procedures").

■ The duty to stabilize patients with emergency conditions and the process of transferring them are set forth in subsections (b) and (c), respectively. If an emergency medical condition is detected during the screening, then an additional duty arises, and the hospital must either: provide further medical examination and treatment required to stabilize the condition, or transfer the individual to another facility in accordance with subsection (c). *See* 42 U.S.C. § 1395dd(b)(1); *In Matter of Baby "K",* 16 F.3d 590 (4th Cir.1994). Subsection 1395dd(e)(1) defines "emergency medical condition" as: "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate

medical attention could reasonably be expected to result in—(A) placing the patient's health in serious jeopardy, (B) serious impairment to bodily functions, or (C) serious dysfunction of any bodily organ or part." 42 U.S.C. § 1395dd(e)(1). Under this definition, a patient will suffer from an emergency medical condition if he is in "imminent danger of death or serious disability." *Thornton v. Southwest Detroit Hosp.*, 895 F.2d 1131, 1134 (6th Cir.1990).

Therefore, once it is established that a patient appeared at a hospital's emergency department with an emergency medical condition, or when an individual has been diagnosed as presenting an emergency medical condition, the hospital must provide that treatment necessary to prevent the material deterioration of the individual's condition or provide for an appropriate transfer to another facility. The hospital will be liable under EMTALA either if it fails to detect the nature of the emergency condition as a result of a disparate screening or, if the hospital detects the emergency condition, by failing to stabilize the condition prior to releasing the plaintiff. *See Deberry v. Sherman Hosp. Ass'n*, 741 F.Supp. 1302, 1305 (N.D.Ill. 1990).

A plaintiff seeking to show a violation of subsections (b) or (c) must show that the hospital had actual knowledge of his or her emergency medical condition. *See Urban v. King*, 43 F.3d 523, 525–26 (10th Cir.1994); *Baber v. Hospital Corp. of America*, 977 F.2d 872, 883 (4th Cir.1992); *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 270 (6th Cir.1990). Actual knowledge is not required, however, to show a violation of subsection (a), because screening usually precedes a conclusion that an emergency condition exists.

Finally, the Court must clarify that EMTALA does not create a cause of action for medical malpractice. *See Gatewood*, 933 F.2d at 1041. A faulty screening does not give rise to an EMTALA claim. *See Correa*, 69 F.3d at 1192 ("A refusal to follow regular screening procedures in a particular instance contravenes the statute, but faulty screening in a particular case, as opposed to disparate screening or refusing to screen at all, does not contravene the statute") (citations omitted); *Baber*, 977 F.2d at 878 ("While EMTALA requires a hospital emergency department to apply its standard screening examination uniformly, it does not guarantee that the emergency personnel will correctly diagnose a patient's condition as a result of this screening").

Rather, an EMTALA claim may only ensue for failure to screen in a manner comparable to others brought into the emergency room with the same conditions. That is to say, the treatment administered to Gian Javier must have *differed significantly* from the treatment offered to patients arriving at the emergency room under the same conditions. 42 U.S.C. § 1395dd(a); *Guadalupe v. Negrón Agosto*, 299 F.3d 15, 18 (D. Puerto Rico 2002); *Correa*, 69 F.3d at 1192 ("The essence of EMTALA's screening requirements is that there be some screening procedure and that it be administered evenhandedly"); *Reynolds v. MaineGeneral Health*, 218 F.3d 78, 84 (1st Cir.2000) (screening received must have been "materially different" than that provided to others in the same condition).

Thus, there is both a substantive and a procedural component to an appropriate medical screening under EMTALA: "[a] hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that

level of screening uniformly to all those who present substantially similar complaints." *Id.*

*Guadalupe,* 299 F.3d at 19. In the instant case, the parties agree that upon his arrival at the emergency room, Gian Javier presented an emergency condition and that the medical staff knew of this condition. Therefore, the question is whether the hospital failed to detect the nature of the emergency condition as a result of a disparate screening or if it failed to stabilize the condition prior to transferring him. Simply put, the treatment Doctors Center administered to Gian Javier must have differed significantly from the treatment offered to patients arriving at the emergency room under the same conditions in order for this cause of action to ensue.

 As an initial matter, the Court finds that Gian Javier almost continuously received treatment after he arrived at Doctors Center Hospital until he departed via Aeromed to the Centro Médico, and therefore this is a prima facie showing that the screening requirement was met. *See Reynolds,* 218 F.3d at 83–84; *see also* "Nurse's Notes", Plaintiffs' *Exhibit 6* and Defendant's *Exhibit III,* showing entries in Gina Javier's record for: 5:00, 5:03, 5:05, 5:15, 5:20, 5:20 again, 5:30, 5:30 again, 6:00, 6:20, 6:45, 7:00, 7:15, 7:30, 7:45, 8:15, 8:30, and 8:45 p.m. However, after comparing the procedures ordered by Dr. Rodríguez and the standard hospital Protocol for management of a poly-traumatized patient, the Court finds that out of the 28 procedures contained therein, Dr. Rodríguez complied with 22 of them, and that the staff complied with 21 of them. *Compare* Plaintiffs' *Exhibit 6,* Defendant's *Exhibit IV* to Plaintiffs' *Exhibit 6,* Defendant's *Exhibit III.*

Specifically, Dr. Rodríguez ordered: cardiac monitoring (No. 7 on the Protocol) endotracheal intubation (not on the Protocol); oxygen therapy (Nos. 4, 5 on the Protocol); new peripheral vein canalization (No. 9 on the Protocol); IV fluids with normal saline solution and ringer lactate to run full drip (No. 9 on the Protocol); foley catheter (No. 12 on the Protocol); reduction and traction of the left femoral fracture (No. 19 on the Protocol); laboratories (CBC, arterial blood gases, coagulation test, chemistry test, type and cross match) (No. 10 on the Protocol); x-ray (chest, skull, left leg and KUB) (No. 14 on the Protocol); Manitol and Decadron (administration of medication not on the Protocol); Tetanus Toxoid (No. 17 on the Protocol); antibiotic IV (No. 16 on the Protocol); mechanical ventilation (No. 4 on the Protocol); brain CT Scan (not on the Protocol); Narcan (administration of medication not on the Protocol); nasogastric tube (No. 13 on the Protocol) and gastric lavage (not on the Protocol). The Court notes that some of the procedures ordered by Dr. Rodríguez' were not included in the protocol, and thus *went further* than the Protocol (for instance, the gastric lavage).

In addition, although not explicitly complied with [3] the Court finds that the hospital complied with No. 20(a) in the Protocol (Noting the patient's Glasgow Coma Scale; Defendant's *Exhibit III* at 1); complied with No. 20(b) in the Protocol (Examining the head for liquids in the ears—Defendant's *Exhibit III,* at 1); complied with No. 20(d)(1) in the Protocol (examining patient for injuries to abdomen—Dr. Rodríguez' deposition at 85–86, 95; Plaintiffs' *Exhibit 6* at 5; Defendant's *Exhibit III* at 4); and complied with No. 20(e)(1) in the Protocol (examining patient for injuries to the pelvis—Dr. Rodríguez' deposition at 85–86, Plaintiffs' *Exhibit 6* at 5).

**3.** Protocol mandated that these signs be noted in a form called the "trauma sheet".

Only one of all of these, the brain CT scan, which the Court was unable to find in the Protocol, and therefore, was not on the Protocol, was not complied with.

Plaintiffs attempt to raise an issue of material fact by apparently combing through the protocol, detecting all deviations therefrom and labeling them as "disparate" treatment. However, the Court finds no such disparate treatment occurred here as evidenced above. *See Feighery v. York Hosp.*, 59 F.Supp.2d 96 (D.Me.1999) (Holding no EMTALA violation for failure to conduct neuro tests, *de minimus* deviations from hospital's standard screening examination). For instance, Plaintiffs allege that the hospital failed to document the secondary evaluation in the trauma sheet. However, a second evaluation was in fact performed, as discussed in the previous paragraph, even if it was not documented in the trauma sheet or labeled as such.

■ Plaintiffs further aver that Gian Javier's vital signs were not taken exactly every fifteen (15) minutes as stated on the protocol. However, the Nurse's Notes indicate that this procedure, even if it was not followed exactly, was substantially complied with. *See* "Nurse's Notes", showing annotations for vital signs and general monitoring at 5:50, 5:30, 6:00, 6:20, 6:45, 7:15 and before getting on the air ambulance at 8:30 p.m. *See also Hutchinson v. Greater S.E. Comm. Hosp.*, 793 F.Supp. 6 (D.D.C.1992) (Holding that EMTALA requires no documentation of screening examination and deviation from this does not establish a cause of action under said statute). A person cannot expect precise and exact times for emergency room procedures, given the fact that it is a high traffic and congested area, and in the midst of other emergencies. Therefore, the Court finds that the taking of the vital signs was not *exactly* complied with,

but was sufficient to meet EMTALA requirements.

In addition, the Court can see that, although not listed in Gian Javier's medical record, even more requirements from the hospital's Protocol were met: moving of the patient to the operating room of emergency room or CPR (No. 1 in the Protocol; uncontested fact No. 7); re-evaluation of vital signs (No. 21 in the Protocol; "Nurse's Notes"); Ordering of blood (No. 23 in the Protocol; uncontested fact No. 30); a consultation with the surgeon on call (No. 24 in the Protocol; uncontested fact 19, Dr. Rodríguez' deposition at 75, 84–86); making the necessary arrangements for the transfer to the Centro Médico (No. 26 in the Protocol, uncontested fact No. 27); obtaining consent for the procedures (No. 25 in the Protocol, uncontested fact No. 36); the use of an adequately equipped ambulance (No. 27 in the Protocol; uncontested fact No. 27); and that the doctor in charge of the patient sign the forms (No. 28 in the Protocol; Plaintiffs' *Exhibit 6*, Defendant's *Exhibit III*, pages 1–4).

■ The Court also notes Plaintiffs' eagerness to point out deviations from the protocol in stating that every single item in the Protocol must be complied with. However, some of the indications in the Protocol were not necessary in order to ascertain the actual level care provided, such as number 3 (listing the factors which the staff must do to prepare for treatment); *see* Deposition of Dr. Rodríguez at 99 ("Each patient has his own particular way at the moment of an emergency, but that is a guide to be followed, but it's not a cooking recipe"). Therefore, the fact that all the requirements in the protocol were not met is not indicative that an EMTALA claim is present—it is the *treatment or care* provided that must be administered even-handedly. The fact that Doctors

Center might have not filled out specific forms (for instance, regarding the discharge and transfer from the emergency room) does not change the fact that the *treatment* provided was administered according to the Protocol. The Court further notes that some of the requirements in the Protocol might not have been immediately necessary, and once again, the mere fact that the hospital did not comply with some of them does not automatically give rise to an inference that EMTALA was violated. *See Hutchinson,* 793 F.Supp. 6 (EMTALA requires no documentation of screening examination and deviation from this does not establish a cause of action under EMTALA).

 The Court further notes that Plaintiffs make a series of assumptions, now based on hindsight, and now with the expertise of an expert, that simply cannot be utilized to create a genuine issue of material fact. Dr. Raúl Marcial, one of Plaintiffs' expert witnesses, also appears to have combed through the protocol in order to be able to determine what aspects of it were not complied with. Like Plaintiffs, his disparate treatment analysis is reduced to: the recording (or lack thereof) of the vital signs in the trauma page; the performance (or lack thereof) of the secondary evaluation; and the fact that a radiologist was not called to examine x-rays. This is not enough to establish disparate treatment under EMTALA. However, even more importantly, the Court must mention that it finds that Dr. Marcial's evaluation of the screening afforded to Gian Javier is flawed, since he begins his analysis by stating "If an adequate and proper evaluation and screening would have been performed on this patient, as it is required, a correct diagnosis would have been established". *Dr. Marcial's Report* at 4. In other words, Dr. Marcial is of the opinion that a correct diagnosis would have result-

ed if a proper screening would have been conducted.

 This misconstrues the proper focus under EMTALA, which only requires that an *evaluation and screening be performed equal to that of similarly situated patients.* Under this standard, a proper evaluation and screening can be performed, *and the result can still be a misdiagnosis. See Baber,* 977 F.2d at 878 (4th Cir.1992) (Under EMTALA, the standard screening examination must be applied uniformly, but that does not guarantee that the emergency personnel will correctly diagnose a patient's condition as a result of this screening). Further, the Court finds his report to be centered on standard medical malpractice instead of EMTALA disparate screening violations. "These two procedures ... are mandatory requirements according to the norms established for the good practice of medicine in these circumstances") *Dr. Marcial's Report* at 5; "The secondary evaluation of the patient, as well as the primary one ... was totally inadequate and does not comply, even remotely, with the Trauma Management Protocol of the American College of Surgeons Advanced Trauma Life Support", *Id.;* "Dr. Rodríguez Martínez must have recognized that the patient was in shock, probably in hypovolemic shock". *Id.* at 6.

Dr. Lautz' expert report fares no better. He limits his report to what, in hindsight *should have been done in compliance with accepted medical standards* to Gian Javier (some procedures which were not on the hospital Protocol), instead of analyzing whether a substantially disparate screening occurred. "In my opinion, this case presents a significant important departure from accepted medical standards in the management of blunt trauma in a number of respects" *Dr. Lautz' Report* at 2; "To leave a patient who presents as a multi-

trauma victim with a class four hemorrhagic shock and to then not resuscitate him beyond the first bolus for some two and a half hours is completely *outside the standards of care* ", *Dr. Lautz' Report* at 3 (emphasis added); "In addition to aggressive and early fluid resuscitation, the patient *should have been ordered* for a cervical spine series . . . *Id.* (emphasis added); "A head CT may have been useful, but an abdominal CT, which was critical, was not ordered". *Id.;* "His resuscitation throughout the entire emergency room visit was woefully inadequate . . ." *Id.* at 4. Again, while both expert's reports may create an issue of fact with regard to whether Dr. Rodríguez' treatment of Gian Javier deviated from accepted medical standards of care, a topic not at issue here, it does not create a material question of fact as to whether Dr. Rodríguez examined Gian Javier substantially differently from any other patient with a similar history, signs, and symptoms according to hospital protocol. *See Jones v. Wake Cty. Hosp. Sys., Inc.,* 786 F.Supp. 538 (E.D.N.C.1991) (Holding that hospital is not liable if it acts consistently with its customer screening procedure, even if said procedure would be inadequate under state malpractice law).

■ Under these circumstances, the Court cannot hold that an inadequate screening and treatment occurred. Doctors Center had a clear manual describing internal procedures for treatment of polytraumatized patients such as Gian Javier. *See generally Protocol.* Dr. Rodríguez went almost by the book in the procedures and treatment administered to Gian Javier, and even went further than the Protocol dictated and ordered treatments not therein stated. Therefore, Plaintiffs' claims that he did not follow hospital pro-

cedure and performed a faulty screening ring hollow. The Court finds that Plaintiffs' criticisms of Dr. Rodríguez' diagnosis and treatment of Gian Javier are indistinguishable from the standard of care criticism that one would hear from an expert in a malpractice case triggered by a mis-diagnosis.

Regarding the spleen, Dr. Rodríguez specifically stated that he not only consulted with the surgeon, Dr. Psarras, regarding Gian Javier's spleen (No. 24 in the Protocol), but that when he himself examined Gian Javier's abdomen, it was "depressible, soft", and that "it had given me no indication that it had ruptured". (No. 20(d) in the Protocol; Dr. Rodríguez deposition at 94.) Dr. Psarras came to the same conclusion when he examined Gian Javier: his abdomen was depressible. Plaintiffs' *Exhibit 6,* Defendant's *Exhibit III* at 5.[4] Aremoed's notes indicate the same thing. Defendant's *Exhibit VI* at 5. Further, Dr. Rodríguez performed a gastric lavage and found coagulated blood, which in his opinion, was further evidence that the blood came from the head injury, not from an internal ruptured spleen. Dr. Rodríguez' deposition at 60–61. Plaintiffs' allegations that he "knew" or "should have known" about Gian Javier's ruptured spleen are issues that go to malpractice, not a disparate screening analysis.

■ Again, the Court must mention that under EMTALA, the issue is not what *deficiencies* in the standard of emergency room care contributed to a mis-diagnosis, but rather whether the procedures followed in the emergency room, even if they resulted in a mis-diagnosis, were reasonably calculated to identify a patient's critical medical condition. *See Gatewood,* 933

---

4. A depressible, soft abdomen indicates that there hasn't been any type of internal rupture of organs.

F.2d at 1041; *Guadalupe,* 299 F.3d at 21; and *Green v. Reddy,* 918 F.Supp. 329 (D.Kan.1996) (Holding no violation of EMTALA when hospital knew emergency condition existed, but there was no evidence that it had specific knowledge of collapsed lung or torn renal artery prior to transfer). The Court thinks the screening and treatment offered by Doctors Center, even if it resulted in a mis-diagnosis, were adequate under the auspices of EMTALA. Therefore, Plaintiffs' claims under EMTALA for inadequate screening are not viable, and are hereby **DISMISSED WITH PREJUDICE.**

### B. *Stabilization Before Transfer*

Plaintiffs' second claim comes under the EMTALA statute which requires that the hospital or emergency room stabilize the patient before transferring him to another facility. Under 42 U.S.C. § 1395dd(c),

If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B) of this section), the hospital may not transfer the individual unless—

(A)(i) the individual (or a legally responsible person acting on the individual's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility,

(ii) a physician (within the meaning of section 1395x(r)(1) of this title) has signed a certification that [FN1] based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual and, in the case of labor, to the unborn child from effecting the transfer, or

(iii) if a physician is not physically present in the emergency department at the time an individual is transferred, a qualified medical person (as defined by the Secretary in regulations) has signed a certification described in clause (ii) after a physician (as defined in section 1395x(r)(1) of this title), in consultation with the person, has made the determination described in such clause, and subsequently countersigns the certification; and

(B) the transfer is an appropriate transfer.

42 U.S.C. § 1395dd(c). An appropriate transfer, in turn, is described as one:

(A) in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health and, in the case of a woman in labor, the health of the unborn child;

(B) in which the receiving facility-

(i) has available space and qualified personnel for the treatment of the individual, and

(ii) has agreed to accept transfer of the individual and to provide appropriate medical treatment;

(C) in which the transferring hospital sends to the receiving facility all medical records (or copies thereof), related to the emergency condition for which the individual has presented, available at the time of the transfer, including records related to the individual's emergency medical condition, observations of signs or symptoms, preliminary diagnosis, treatment provided, results of any tests and the informed written consent or certification (or copy thereof) provided under paragraph (1)(A), and the name and address of any oncall physician (described in subsection (d)(1)(C) of this section) who has refused or failed to

appear within a reasonable time to provide necessary stabilizing treatment;

(D) in which the transfer is effected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer.

42 U.S.C. § 1395dd((c)(2).

It is clear from the statute that only unstable patients require a certification and consent of the receiving hospital.

On the other hand, a patient who has been stabilized in the emergency room of the transferring hospital may be transferred to a receiving hospital without a certification, as described above, and without obtaining the express agreement of the receiving hospital. In other words, stabilized patients may be transferred without limitation under the language of the statute. Therefore, in order to prove a transfer violation, Plaintiffs must show not only that the transferred patient was not stabilized and was not accepted by the receiving hospital, but also that the doctor was negligent in transferring the patient in the sense that, under the circumstances, "the physician knew or should have known that the benefits [of transfer] did not outweigh the risks." *Cherukuri v. Shalala,* 175 F.3d 446, 450 (6th Cir.1999). As with screening, in determining whether or not a patient has been stabilized, the Court must consider whether the medical treatment was reasonable in view of the circumstances that existed at the time the hospital discharged or transferred the individual and at the time the diagnosis was made. *See Delaney v. Cade,* 986 F.2d 387, 393 (10th Cir.1993).

Once again, the Court makes clear that EMTALA liability does not hinge on the result of the plaintiff's condition after the release or transfer, but rather on whether the hospital would have considered another patient in the same condition as unstable that would not warrant his or her release or transfer. *See Cleland v. Bronson Health Care Group, Inc.,* 917 F.2d 266, 269 (6th Cir.1990).

The Fourth Circuit has reached a conclusion that to stabilize for purposes of transfer is a relative concept that depends on the situation:

The stabilization requirement is thus defined entirely in connection with a possible transfer and without any reference to the patient's long-term care within the system. It seems manifest to us that the stabilization requirement was intended to regulate the hospital's care of the patient only in the immediate aftermath of the act of admitting her for emergency treatment and while it considered whether it would undertake longer-term full treatment or instead transfer the patient to a hospital that could and would undertake that treatment.

*Bryan v. Rectors of the University of Virginia,* 95 F.3d 349, 352 (4th Cir.1996). Assuming facts most favorable to the nonmoving party, the Court will assume that Gian Javier was *not* stable at the time of his transfer. Therefore, the question becomes whether an appropriate transfer was performed. Plaintiffs allege that no relative of Gian Javier ordered the transfer, but instead that it was Dr. Rodríguez who ordered it. However, under EMTALA, a hospital may transfer an unstable patient with an emergency condition if the patient or a legal representative gives informed consent *or* a physician certifies that the benefits expected from the transfer outweigh the risks of effecting the transfer. *See* 42 U.S.C. § 1395dd(c)(1); *Estate of Robbins v. Osteopathic Hosp. Founders Assoc.,* 178 F.Supp.2d 1221 (N.D.Okl.2000). Therefore, under the dis-

junctive language of the statute, either of these circumstances preclude liability.

Applied to the case at bar, Dr. Rodríguez certified in writing that, in his best judgment, it was necessary to transfer Gian Javier to Centro Médico because of his condition at that time and according to the diagnosis. *See* Dr. Rodríguez' deposition at 86, 94; Defendant's *Exhibit VI* at 25; and Plaintiffs' *Exhibit 6,* Defendant's *Exhibit VII.* In addition, the certification indicated that the benefits of transfer outweighed the risks to the patient. Plaintiffs' *Exhibit 6,* Defendant's *Exhibit VI,* "Certification and Transfer Authorization" ("Certificación y Permiso de Traslado"). Again, the fact that the diagnosis later turned out to be erroneous is immaterial to this particular analysis. Further, the consultation with Dr. Benjamin Rodríguez of medical control [5] stated that "the patient needed to be in the operating room as soon as possible", and that they "should proceed with the transfer." "Aeromed Progress Notes", Defendant's *Exhibit VI* at 7. In addition, the Protocol for the treatment of poly-traumatized patients like Gian Javier indicated that the proper procedure in those cases was a transfer of the patient to Centro Médico. *See* Protocol No. 26. The Centro Médico accepted Gian Javier as a patient. *See* "Nurse's Notes", Plaintiffs' *Exhibit 6* at 15, Defendant's *Exhibit III* at 15. As a final matter, Gian Javier's mother, Mrs. Molina, signed the certification stating that she understood Dr. Rodríguez' explanations and that she accepted the transfer voluntarily. Plaintiffs' *Exhibit 6,* Defendant's *Exhibit VII.*

A hospital is charged only with the responsibility of providing an "adequate first response to a medical crisis" which "means the patient must be evaluated and, at a minimum, provided with whatever medical support services and/or transfer arrangements that are consistent with the capability of the institution and the well-being of the patient." 131 Cong. Rec. 28569 (1985). Obviously a doctor in Dr. Rodríguez' position must weigh what he can do for a patient at his hospital at that moment versus the services available at the receiving hospital. Under the particular circumstances of the case at bar, the Court can find no violation of the transfer requirement. *See generally, Cherukuri,* 175 F.3d 446.

The Court finds that this case is, maybe, a medical malpractice case. EMTALA is not the federal counterpart of a state medical malpractice suit. Plaintiff's EMTALA claims for inappropriate transfer are therefore also hereby **DISMISSED WITH PREJUDICE.**

### C. *Malpractice Claims*

Plaintiffs also bring forth claims for malpractice against Dr. Psarras and Dr. Rodríguez under Articles 1802 and 1803 of the Puerto Rico Civil Code. After having dismissed all the federal claims in this case, the Court does not reach the issue at this time of whether it will entertain Plaintiffs' malpractice claims brought under Puerto Rico law until the nature of the claims is clarified.

### V. CONCLUSION

In conclusion, the Court **GRANTS** Summary Judgment in favor of Defendant Doctors Center Hospital, and hereby **DISMISSES** Plaintiffs Ana Rivera, Tomás Molina, Giovanna Molina, and Cristal Molina's EMTALA claims **WITH PREJUDICE.** Regarding Plaintiffs' state law

---

5. As previously stated, the medical control staff receives the calls and decides whether the use of an Aeromed helicopter is justified in light of the particular circumstances of each case.

claims for malpractice, the Court does not decide at this time whether it will exercise supplemental jurisdiction over them.

**IT IS SO ORDERED, ADJUDGED AND DECREED.**